REYNARD CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 78835.   Promulgated March 29, 1938.

*E. V. McKeown, Esq.*, and *Frank J. Albus, Esq.*, for the petitioner.
*J. R. Johnston, Esq.*, for the respondent.

554

OPINION.

Hill: The petitioner concedes its liability as a transferee of the assets of Reynard for any additional tax found to be due and there is, therefore, no controversy between the parties on that point.

In its petition as amended petitioner alleges that respondent erred in determining that the $3,000 rental value of the dwelling occupied by Fox during the fiscal year. ended March 31, 1932, as compensation for his services, in addition to his salary, was not deductible as a corporate expense for the reason that there was no evidence as to whether such additional compensation was reasonable. The facts show that, while the respondent went through the formality of eliminating the $3,000 rental value of the residence from income and of disallowing the deduction of the amount thereof, Reynard's net income as reported in its return wherein the $3,000 was included in income as rent and was deducted as salary, remained unchanged.

If Reynard had rented the dwelling to Fox and had received $3,000 cash therefor during the taxable year there would be no question but that the amount would be includable in income as rent. If during the taxable year Reynard had paid the $3,000 to Fox as a part of reasonable compensation for his services there would be no question but that such payment would constitute a deductible expenditure. The net effect of the two items would be to offset each other, and Reynard's net income apart from them in no wise would be affected. Instead of making cash payments to each other, Reynard gave Fox the use of the house for services and Fox rendered to Reynard the required services for the use of the house. Since Reynard reported in its income $3,000 as rent and as it deducted $3,000 as the payment for services, the two amounts offset each other and Reynard's taxable net income was neither increased nor diminished by the way the items were reported in the return. Since respondent's determination in effect has made no change in the two items as reported by Reynard.

no injury has resulted to Reynard. The only theory upon which it can be held that Reynard paid the $3,000 to Fox is that it offset that amount against a like amount owed to it by Fox for house rent. Under this theory the rental value of the house was income to petitioner and, if the deduction claimed is to be allowed, such income must be accounted for in determining its correct tax liability. To allow Reynard a deduction of the $3,000 on any other theory would be allowing a deduction for an amount which it neither paid nor was obligated to pay. Therefore, since Reynard is not charged for tax purposes with income from house rent it is not entitled to deduct the amount thereof as compensation paid to Fox.

Petitioner contends that our decision at 30 B. T. A. 451, which involved Reynard's tax liability for the fiscal years ended March 31, 1930 and 1931, is authority for the proposition that if it be shown that the $3,000 plus the $30,000 paid in cash constituted reasonable compensation for Fox's services, then it is an allowable deduction. Petitioner also urges that our decision there renders the question *res judicata*. For the fiscal years 1930 and 1931 Reynard reported no amount as income with respect to the rental value of the dwelling, nor did it deduct any amount with respect thereto as compensation paid Fox. In determining the deficiencies for those years respondent included in Reynard's income $3,000 for the fiscal year 1930 and $7,400 for the fiscal year 1931 as representing the rental value of the residence, but made no change in the deduction taken in each of the years as compensation paid Fox, namely, $30,000. In appealing to this Board Reynard assigned errors as to respondent's action in including the $3,000 and the $7,400 in its income for the respective years, but assigned no error as to the respondent's failure to increase the deductions of $30,000 for compensation paid Fox by the amounts included in income as rental because of Fox's occupancy of the dwelling. The only other error assigned to respondent's determinations for those years was as to his disallowance of a deduction in the fiscal year 1930 of $2,588.85 for depreciation because of Fox's occupancy of the residence. From the foregoing it is clear that the issues involved in the proceeding for the prior years are entirely different from that involved here. There we held that the amounts included in income by respondent on account of Fox's occupancy of the dwelling did not constitute income to Reynard and that Reynard was entitled to the deduction taken for depreciation. Although not an issue in the proceeding, we discussed the question as to whether Reynard was entitled to deduct $3,000, the rental value of the dwelling, from income. We concluded that it was not, giving only as our reason therefor a lack of evidence to show that the amount plus the cash payment of $30,000 constituted reasonable compensation for Fox's services. While the reason given for our conclusion was sufficient

under the circumstances, we could have consistently given as an added reason therefor that, since the basis of Reynard's claim of deduction was that it had paid Fox $3,000 as additional compensation by providing for his use a dwelling of a rental value of $3,000, such basis disappeared upon the elimination of the item of rental from Reynard's income in determining its tax liability. If that item of rental was not income to Reynard in the form of an obligation owed to it, there was nothing against which to offset the $3,000 of claimed added compensation to Fox and Reynard did not pay such compensation either actually or constructively and hence was entitled to no deduction therefor.

The points or questions tried and adjudicated in the former proceeding involved taxable years prior to that involved here and grew out of respondent's treatment of certain amounts as income, while the point or question in the present proceeding involves the allowance of a deduction. There was a sufficient difference between the issues involved in the two proceedings to prevent our decision in the prior proceeding from being *res judicata* of the question involved here. Cf. *Volunteer State Life Insurance Co.*, 35 B. T. A. 491, and cases there cited.

The respondent determined that Reynard was subject to tax under the provisions of section 104 of the Revenue Acts of 1928 and 1932. His determination is contested by petitioner. The pertinent statutory provisions are as follows:

SEC. 104. ACCUMULATION OF SURPLUS TO EVADE SURTAXES.

(a) If any corporation, however created or organized, is formed or availed of for the purpose of preventing the imposition of the surtax upon its shareholders through the medium of permitting its gains and profits to accumulate instead of being divided or distributed, there shall be levied, collected, and paid for each taxable year upon the net income of such corporation a tax equal to 50 per centum of the amount thereof, which shall be in addition to the tax imposed by section 13 * * *.

(b) The fact that any corporation is a mere holding or investment company, or that the gains or profits are permitted to accumulate beyond the reasonable needs of the business, shall be prima facie evidence of a purpose to escape the surtax.

See section 104 of the Revenue Acts of 1928 and 1932.

The general purpose and scope of the foregoing provisions have been considered in prior decisions and it is not necessary to restate them here. See *Rands, Inc.*, 34 B. T. A. 1094. Whether a corporation was organized or availed of for the purpose interdicted by the statute is a question of fact. *Commissioner* v. *deMille Productions, Inc.*, 90 Fed. (2d) 12; certiorari denied, 302 U. S. 713; *Almours Securities, Inc.* v. *Commissioner*, 91 Fed. (2d) 427. The respondent's determination is presumed to be correct and must be sustained unless the evidence shows otherwise. *Nipoch Corporation*, 36 B. T. A. 662.

Petitioner takes the position that Reynard was neither formed nor availed of for the interdicted purpose. Respondent's position is that it was both organized and availed of for that purpose. Fontaine Fox, who caused Reynard to be organized, stated that in forming it he thought its formation would facilitate the execution of certain contemplated business ventures, including some real estate ventures, that by the corporation owning the real estate the necessity of his wife's signature in case of sales of the property would be unnecessary; that it would facilitate the distribution by will to his children of his property and in event of his death would permit more readily the uninterrupted continuation of the publication of his creations. A corporation organized for the foregoing objects alone would not fall within the interdicted purpose, but the fact that it was organized for such objects is not incompatible with the purpose to prevent the imposition of surtax on its stockholders. Fox categorically stated that in forming Reynard he did not have in mind preventing the imposition of surtax upon his personal income. Such testimony, however, is not to be accepted as conclusive, especially when there is other evidence inconsistent with it. *Rands, Inc., supra.*

By 1923 Fox was receiving from the syndication of his cartoons $1,500 or $2,500 a week, or from $78,000 to $104,000 a year. At the time of the formation of Reynard in 1924 he knew that he personally could get a three-year contract with the Bell Syndicate that would pay him a guaranteed minimum of $1,500 a week, or $78,000 a year, for the use of his creations for syndication purposes. There was no requirement by the syndicate that a corporation be formed. Nor was there any requirement that it have substance and financial responsibility, as in *Fisher & Fisher, Inc.*, 32 B. T. A. 211. Instead of entering into the contract personally, Fox, after transferring the greater portion of his property to Reynard for all of its capital stock, entered into a contract with Reynard at a salary of $2,500 a month, or $30,000 a year, to furnish the creations that would be required by the syndicate and then on the same day caused Reynard to enter into a three-year contract with the syndicate for the guaranteed minimum of $1,500 a week for the use of the creations. By this action Fox diverted to Reynard for the next three years at least $48,000 a year of the proceeds resulting from his services. This diverted amount was increased to about $70,000 annually in years subsequent to 1927, when the minimum amount paid by the syndicate was increased to $104,000 a year without there being an increase in the salary of $30,000 a year paid to Fox. Neither Fox nor petitioner explained why it was necessary for such substantial portions of the proceeds from Fox's services to be diverted to Reynard from its very inception

in order to effect the objects Fox stated he had in mind when he caused Reynard to be formed. The situation here is similar to that in *Edward G. Swartz, Inc.*, 33 B. T. A. 355. There Swartz, the owner of a contract under which it was expected he thereafter would receive payments totaling about $500,000 over a period of about four years, organized a corporation and transferred to it the contract, along with certain other assets, in payment for its entire capital stock. The principal business of the corporation thereafter was to receive the payments under the contract. That corporation was held to have been availed of for the interdicted purpose.

Respecting Fox's statement that he thought Reynard's formation would facilitate the execution of certain real estate ventures, only one transaction of this nature was entered into by Reynard down to March 31, 1932. It was entered into for the purpose of providing a dwelling, studio, and garage for the use of Fox, the dwelling being for his exclusive personal use. Such other real estate transactions as were entered into during this period were by Fox in Florida on his own personal account and in them he used a substantial portion of the only dividend paid by Reynard during the period. In 1934 Reynard purchased 15 acres of suburban land but there is nothing to indicate where the land was situated or what the purchase price was. It may well be that only a nominal sum was involved.

Reynard invested to a considerable extent in policies of insurance on the life of Fox. While he stated that he thought that the policies were payable to Reynard, he added that it was his expectation that his two children would get the benefit of them.

Aside from its connection with the Short Film Syndicate, which was dissolved in 1928, Fox stated that Reynard's purchases of stocks and bonds were for the purpose of holding its surplus funds in the form of securities and not for the purpose of having resources on hand in case it was decided that Reynard should enter into some other business or venture.

Considering the circumstances surrounding the formation of Reynard, the source of its income, and the manner in which its income was handled, we think that it was formed for the purpose of preventing the imposition of surtax on the greater portion of the proceeds from Fox's personal services and on the income arising from property transferred by him to it and on the income arising from the investment of such proceeds and income. Reynard's having been formed for such purpose is alone sufficient to sustain respondent's determination. *Saenger, Inc.* v. *Commissioner*, 84 Fed. (2d) 23, affirming 33 B. T. A. 135; *Rands, Inc.*, *supra.*

In the event we are in error as to our conclusion that Reynard was formed for the interdicted purpose, we will consider whether it

was availed of during the year in controversy for that purpose. Under the revenue acts, if a corporation is a mere holding or investment company or if its gains or profits are permitted to accumulate beyond the reasonable needs of its business, either of such facts constitutes prima facie evidence of a purpose to escape surtax.

Considering the character of the property turned over to Reynard by Fox and the proportion it constituted of that owned by him, together with the nature and source of Reynard's earnings and the manner in which they have been invested and were invested on March 31, 1932, we think Reynard was a mere holding or investment company and that such limited activities as it engaged in were only incidental to its main purpose as such a company. Cf. *R. & L., Inc.*, 33 B. T. A. 857; affd., 84 Fed. (2d) 71; certiorari denied, 299 U. S. 588.

Conceding for the sake of discussion that Reynard was not a mere holding company, were its profits or gains permitted to accumulate beyond the reasonable needs of its business? In attempting to justify the failure to make a distribution of gains and profits during the year in controversy, Fox stated that the directors considered it necessary for Reynard to conserve its surplus to provide for the syndication of his creations in event the Bell Syndicate went out of business or declined to renew the contract at its expiration, which would require an investment of about $75,000; to provide funds for Reynard engaging in the production of sound films featuring animated cartoons created by him, which would require about $100,000; to provide funds for Reynard's entry into the real estate field, which the directors were contemplating doing; and to provide funds for the expansion of Reynard's transactions in securities.

We recognize that the statute contemplates that any business shall have the right to grow, *William C. DeMille Productions, Inc.*, 30 B. T. A. 826; petition for review dismissed, 80 Fed. (2d) 1010; *R. & L., Inc., supra;* and also that it contemplates that a corporation may provide for contingencies. *Cecil B. DeMille*, 31 B. T. A. 1161; affd., 90 Fed. (2d) 12; certiorari denied, 302 U. S. 713. The reasons advanced by Fox for Reynard's failure to make a distribution of profits during the year in controversy are lacking in persuasiveness. On March 31, 1932, Reynard's contract with the Bell Syndicate had two years to run. There is nothing in the record to indicate that the syndicate was contemplating going out of business or that there was any expectation that the contract would not be renewed at its expiration, as had been done in prior years. Further, the record shows that it was not until in 1937 that a renewal was not made on a term basis as before. Then, however, steps were not taken to syndicate Fox's creations, but a temporary working arrange-

ment was entered into by the petitioner and the syndicate pending negotiations looking toward a contract for a term of years. Down to March 31, 1932, there do not appear to have been any disputes or friction between Reynard and the syndicate respecting the continuation of the contractual relationship between them and the record is bare of any fact existing on that date to cause Reynard's directors to be apprehensive as to the future of such relationship.

From 1924 films of Fox's creations had been made by a picture corporation under a royalty contract with Fox. On April 1, 1932, he assigned this contract to Reynard. So far as we know there has never been any change in this arrangement or in the desirability of its continuation. No action was ever taken by Reynard or petitioner looking toward their production of films of Fox's creations except the organization of the Short Film Syndicate, which was abandoned in 1928 after a short life during which none of his creations were used.

While Reynard's security transactions were somewhat more numerous in the years following March 31, 1922, however, so far as the record shows they were made primarily for the purpose of holding the surplus funds in the form of securities, as was done in prior years. Aside from the purchase of land by Reynard in 1926 for the purpose of providing a residence and studio for Fox, the only other purchase was in 1934 of suburban land which has been considered heretofore.

Petitioner argues that since on March 31, 1932, Reynard was indebted to Fox on open account for a substantial amount and had been indebted to him in substantial amounts in prior years, this is an indication that Reynard was not availed of for the interdicted purpose. Where one who is substantially the sole stockholder of a corporation transfers to it large amounts of his personal funds each year as loans without interest and the corporation, for no business reason, continues to accumulate its profits without distributing them, the stockholder is availing himself of the corporation to prevent the imposition of surtax on the income that would have arisen to him if he had employed the amounts in normal use or investment. *Rands, Inc., supra.* We think that principle is applicable to the situation here.

Considering all the evidence bearing on the point, we are of the opinion that there was no reasonable business need justifying Reynard in retaining its gains or profits instead of distributing them during the year in controversy, and that it was availed of for the purpose of preventing the imposition of surtax on Fox.

Reviewed by the Board.

*Decision will be entered for the respondent.*