CORPORATE INVESTMENT COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 78363. Promulgated December 20, 1939.

*J. G. Korner, Jr., Esq., Frank J. Wideman, Esq.*, and *Richard S. Doyle, Esq.*, for the petitioner.

*Frank D. Strader, Esq., W. Herdman Schwatka, Esq.,* and *Edward L. Updike, Esq.,* for the respondent.

1158

**1168**

MURDOCK: The two issues raised by the respondent will be discussed first, since they may have some bearing upon the main issue. The case of *General Utilities & Operating Co.* v. *Helvering,* 296 U. S. 200, is controlling on the question of whether the distribution of the Loew and Chase stocks resulted in deductible losses. The dividend resolution in that case provided for a dividend of a certain amount payable in a named stock at a declared valuation. The Court held that no sale of the stock resulted and the stock was not used to discharge an indebtedness. Here the dividend resolution was strikingly similar and no deductible losses resulted. The Commissioner erred in allowing the deductions claimed on the return for losses on the two stocks distributed. Cf. *First Savings Bank of Ogden* v. *Burnet,* 53 Fed. (2d) 919; *Commissioner* v. *Columbia Pacific Shipping Co.,* 77 Fed. (2d) 759.

The respondent has failed to show error in his allowance of the deduction of $45,106.98 claimed by the petitioner as accrued interest and a charge of one-fifth on income due to Munroe under the contracts of September 13, 1922, and March 5, 1923. The respondent

concedes that an accrual and a charge in accordance with the terms of the agreements are proper deductions for 1929, but argues that the correct figure is $14,010.79, not $45,106.98. The amount accrued and deducted for 1929 was computed in the same way that similar amounts were computed for all prior years. The evidence fails to show that the computation of the accrual for 1929 was not made in accordance with the intent of the contracting parties as expressed in their contracts. The contention of the respondent seems to be that no interest and no charge of one-fifth is properly accruable on income of prior years. The contract itself and the consistent interpretation of it by the parties are to the contrary. The deduction was properly allowed.

The most important issue for decision is whether the petitioner is subject to tax under section 104 as a corporation "formed or availed of for the purpose of preventing the imposition of the surtax upon its shareholders through the medium of permitting its gains and profits to accumulate instead of being divided or distributed." The decision of that issue must depend, in the final analysis, upon the facts in this particular case. It is, therefore, not surprising that the cases cited by the parties are only of general interest and require no detailed discussion. Both parties seem satisfied that all relevant facts are contained in the rather lengthy record. We have carefully considered all of that record, although not all of it has been set forth in detail in the findings of fact.

The test of "purpose" necessarily depends upon the state of mind of the person or persons responsible for the formation and operation of the corporation. *United Business Corporation of America*, 19 B. T. A. 809; affd., 62 Fed. (2d) 754; certiorari denied, 290 U. S. 635. Even though the effect of the formation and operation of a corporation may have been to avoid surtax upon the stockholders, still section 104 does not apply unless the parties in control had the intent and purpose described in that section. *Cecil B. deMille Productions, Inc.*, 31 B. T. A. 1161; affd., 90 Fed. (2d) 12; certiorari denied, 302 U. S. 713; *C. H. Spitzner & Son, Inc.*, 37 B. T. A. 511; *R. L. Blaffer & Co.*, 37 B. T. A. 851; affd., 103 Fed. (2d) 487; *Mellbank Corporation*, 38 B. T. A. 1108. Here Munroe created the corporation and completely dominated its operation, so that the real question is, What was his purpose in the formation and operation of the petitioner? He has testified that he did not have the purpose described in section 104, either in the formation or the operation of the petitioner. However, he is an interested witness and we have considered, not only his categorical denial of the existence of the proscribed purpose, but also all other evidence which might show that his purpose was, in truth, different from what he says it was.

There is a clear preponderance of evidence to show that the petitioner was not "formed" to avoid surtaxes upon Munroe through the means described in section 104. His primary purpose in forming the petitioner was to profit from the purchase of installment paper. Although he might have had additional purposes, and although some surtaxes may have been avoided eventually, nevertheless, this record indicates no purpose in the formation of the corporation which would bring it within section 104.

The only argument made by the respondent upon this point is that Munroe, a very astute and active man in avoiding taxes, obviously intended from the very beginning to utilize the two contracts, dated September 13, 1922, and March 5, 1923, to avoid tax not only upon himself (since he was on the cash basis and was to receive nothing for ten years, he reported no income) but also upon the corporation, which was using an accrual method whereby it could currently accrue and deduct items eventually payable to Munroe. He does not contend that the agreements were invalid, that Munroe was required by statute to report any items due him under the contracts, [1] or that the petitioner was not entitled under the statutes to accrue and deduct amounts in accordance with the agreements. Yet he attempts to find, in the fact that the contracts were so effective in saving and delaying tax, a purpose to avoid surtax upon Munroe through the medium of having the corporation accumulate its gains and profits instead of distributing them.

One sufficient answer to his argument is at once apparent. The moment the petitioner received anything under the contracts, it became indebted in a like amount to Munroe. It also had to accrue fees and charges on the receipts as amounts due Munroe. The Commissioner recognizes the propriety of these accounts. Thus the amounts due Munroe always were increasing more rapidly than the receipts under the contracts were being accumulated, and those receipts were not increasing the accumulated "gains and profits" of the petitioner or any fund from which dividends of the petitioner could come. The petitioner was permitted to use funds accumulated under the contracts to transact other business from which it might derive gains and profits of its own. But if it had had no business

---

[1] He apparently has thought, in determining the tax liability of Munroe, that the case of *Fremont O. Peck et al., Executors,* 31 B. T. A. 87; affd., 77 Fed. (2d) 857; certiorari denied, 296 U. S. 625, was not in point. There, some securities were loaned to a corporation under a contract somewhat like the one involved in the present case. The corporation had power to sell the securities, but was required to pay to the lender at the end of the period the amount of the dividends which it received on the stock. Although the lender was on the cash basis and did not receive the dividends, nevertheless, she was required to include them in her income for the years in which they were received by the borrower.

transactions, aside from receipts under the contracts, it would have had no accumulation of gains and profits to distribute as dividends and no surtaxes upon its shareholder could have been avoided. The large surplus which it accumulated was not the result of receipts under the contracts, but came from wholly different transactions. Although the contracts may have avoided or delayed tax on Munroe, they do not bring section 104 into play, since their use did not serve to avoid surtax on Munroe through the medium of permitting the gains and profits of this petitioner to accumulate instead of being distributed as taxable dividends to Munroe. Munroe may have been tax conscious and his contracts may have been cleverly drawn to save him from tax, but still this petitioner is not subject to tax under section 104 unless the facts are within the provisions of that section, which Congress has made so definite and specific.

Although the foregoing discussion disposes of the only argument presented by the respondent on the purpose of formation, nevertheless we have considered the evidence from other angles. The history of the corporation during a reasonable period immediately following its incorporation shows that it was using large amounts in the purchase of installment paper but was not successful in accumulating sufficient working capital of its own. It had a paid-in capital of only $6,000 and, at the beginning of 1926, it had accumulated a surplus of only $18,175.30. It began to have greater financial success in 1926, about the time that it ceased purchasing installment notes. But Munroe did not foresee that situation when he formed the petitioner. The evidence does not supply any sound basis for a finding that the purpose in forming this petitioner was such as to bring it within section 104.

The respondent next argues that the petitioner was "availed of" during the period 1922 to 1928, inclusive, for the purpose described in section 104 and the section applies, since Munroe did not include in his gross income for 1929 all of the net income of the corporation. He does not argue that the failure of the petitioner to distribute in 1929 the surplus accumulated in prior years is important. The words of the statute, the legislative history of section 104 and its antecedents, and the general scheme of the revenue acts taxing income upon an annual basis show that Congress intended to apply section 104 in case a corporation was "availed of" *within the taxable year* through the medium of permitting its gains and profits *of that year* to accumulate, but did not intend to tax a corporation under section 104 merely because it had been availed of in other years or because it did not distribute a surplus accumulated in prior years. The income tax acts have always taxed income upon an annual basis and many terms which could refer to a different period

are generally understood to refer to an annual period without any express statement to that effect appearing in the acts. Income, gross income, net income, and dividends are examples. Although some terms, particularly those relating to deductions, are expressly qualified so that they can refer only to the taxable year, nevertheless, where a term is used and is not expressly defined as relating to the taxable year, it is generally so understood. Thus the natural meaning to ascribe to the words "gains and profits" in section 104 is the gains and profits of the taxable year.

Furthermore, the use of the words "to accumulate" instead of some such phrase as "to remain accumulated" [2] is significant. Earnings of prior years may remain accumulated during the year but are not permitted "to accumulate" during that year. If Congress had intended to penalize the corporation for accumulating a surplus in prior years or for failing to distribute such a surplus in the taxable year, it would hardly have measured the penalty by the earnings of the current year or relieved the corporation from the penalty upon condition that the earnings of the current year were distributed to or reported by the stockholders. See subsection (d), which permits the corporation to escape the tax if the stockholders report the net income of the corporation for the particular year as a part of their gross income. The thought back of this "escape clause" was that the penalty should not be imposed upon the corporation if the stockholders, like partners, reported the earnings of that particular year. See Committee Reports on section 220, of the Revenue Act of 1921. The Senate Finance Committee said, when it approved of the counterpart of (d) as section 220 (e) of the Revenue Act of 1926, that there could be no avoidance of surtax on earnings if the stockholders reported their shares of the net income "and the reason for the imposition of the 50 per cent tax on the corporation no longer exists." S. Rept. 52, p. 22, 69th Cong., 1st sess. Thus it appears that Congress was thinking in terms of current income and current gains and profits when it enacted the provisions of section 104. The Bureau has always interpreted similar provisions as referring to "gains and profits" of and "availed of" in the current taxable year. O. D. 188, 1 C. B. 182; I. T. 1572, C. B. II—1, 139. The decisions of the Board are to the same effect. *United Business Corporation of America*, 33 B. T. A. 83; remanded, C. C. A., 2d Cir., Aug. 31, 1936; *Almours Securities, Inc.*, 35 B. T. A. 61; affd., 91 Fed. (2d) 427 (C. C. A., 5th Cir.); certiorari denied, 302 U. S. 765; *Dill Manufacturing Co.*, 39 B. T. A. 1023. Consequently, a detailed discussion of events of prior years is not necessary here, even though those

---

[2] See sec. 10 of the Revenue Act of 1916, as amended by sec. 1206 (2) of the Revenue Act of 1917; sec. 104 (c) of the House Bill of the Revenue Act of 1928.

events might show that the corporation was or was not availed of prior to 1928 for the proscribed purpose. They are important only in so far as they may tend to show a purpose, or lack of purpose, in 1929.

The argument of the respondent on the question of whether the petitioner was "availed of" in 1929 is relatively short. He attempts to show that the "gains and profits" for the purpose of section 104 were $977,909.35; the distributions were limited to $350,000 so that Munroe would escape tax; no liability for the 1927 tax or interest thereon was accrued or accruable in 1929; and the contracts of 1922 and 1923 with Munroe, the losses realized by him upon stock transfers to the petitioner in 1929, and the loans to Munroe, show a purpose to avoid tax, as does the "repeat" attempt to avoid tax through the reorganization of 1930 contemplated in 1929.

The claim of the Commissioner, made in his brief, that the correct amount of "gains and profits" for 1929 was $977,909.35 is not supported by the pleadings or the proof but, on the contrary, is shown by the proof to be erroneous. He includes in that total the amount received during the year under the contracts of 1922 and 1923, contrary to his action in determining the deficiency, and he disregards the increase in the amounts due Munroe which he has heretofore allowed to offset those receipts in computing the deficiency. The words "gains and profits" are not defined in the statute. However, it is obvious that in this case they are not greater than the net income as defined in section 104 (c). The later amount, as determined by the Commissioner in the notice of deficiency, was $671,817.78. The pleadings and proof show that the only proper increase in that figure is $63,402.50, the amount disallowed as loss on the Loew and Chase stocks. Thus the correct amount of net income as defined in section 104 (c) is $735,220.28. The petitioner contends that this figure must be reduced by several items in order to arrive at "gains and profits" within the meaning of those words as used in section 104. The first item is the income taxes for the year 1929 under section 13 as finally determined, and the Commissioner agrees that those taxes are a proper adjustment in arriving at "gains and profits." The correct amount of those taxes under this opinion will be about $73,700.

The petitioner also contends that the shrinkage in value of its securities should be deducted from "net income." The Board, however, has held to the contrary. *Rands, Inc.*, 34 B. T. A. 1094. The other two items which the petitioner would use to reduce "net income" in arriving at "gains and profits" are interest of about $120,000 and lawyers' fees in the amount of $16,666.66. The interest is the amount which accrued during 1929 on the large deficiency for 1927. The lawyers' fees were incurred in 1929 in connection with the 1927 tax

controversy. Both of those items, although not entered on the books as expenses of 1929, were actually incurred as expenses in that year and were later paid. Perhaps they should have been accrued on the books as expenses of 1929. *Lucas* v. *American Code Co.*, 280 U. S. 445. The petitioner contends only that they are items which must be considered in determining how much of the earnings of 1929 were permitted to accumulate instead of being distributed. It may be argued that there is as much justification for reducing "net income" by those two items in order to arrive at "gains and profits" as there is for reducing "net income" by the income taxes for 1929. The taxes for 1929 under section 13 have a direct relation to the year 1929 and will have to be paid. The Commissioner apparently recognizes that earnings, to the extent of the taxes, will not be permitted to accumulate, but will be used to pay the taxes, even though they may serve to swell the book surplus at the end of the year. The situation is exactly the same in relation to the interest on the deficiency for 1927 and the attorneys' fees. All three of the items were incurred during 1929 but not accrued on the books. The interest and attorneys' fees were actually paid in 1930, whereas the taxes have not been fully paid at this time. The amounts necessary to pay those items were accumulated only temporarily. It is difficult to see any distinction unfavorable to this petitioner between the taxes for 1929 and the interest for 1929 on the unpaid deficiency for 1927. The "gains and profits" for 1929 were either $524,853.62, or $661,520.28, depending upon whether or not the interest and attorneys' fees are proper adjustments to "net income" in order to arrive at "gains and profits."

It may be pertinent to determine the amount of the "gains and profits" actually permitted "to accumulate" during 1929. The distribution of the dividend eliminated $413,402.50 from surplus and that amount of the "gains and profits" for the year was not permitted "to accumulate." The basis and book value of the Loew and Chase stocks was $409,902.50, and the distribution of those stocks eliminated that amount from the assets of the petitioner, despite the fact that the distribution was described as a dividend of $350,000, and the petitioner is not entitled to deduct any loss under section 23. But not all of the "gains and profits" for the year were distributed. The amount permitted to accumulate was either $111,451.12, or $248,-117.78, depending upon the treatment to be accorded the interest and attorneys' fees above described. The fact that these "gains and profits" were permitted to accumulate raises the issue but is not determinative of that issue. The important question is, Was there any intention on the part of the corporation and its controlling stockholder, Munroe, to avail of the corporation in 1929 for the purpose of preventing the imposition of the surtax upon Munroe through the

medium of permitting those "gains and profits" of the corporation to accumulate instead of being divided or distributed? It is appropriate, in order to answer that question, to consider the amount of "gains and profits" which Munroe thought the petitioner had towards the close of 1929 and what he proposed to do with these "gains and profits."

Munroe had an estimate made at that time to determine what amount would be available for distribution and would not be needed to pay expenses incurred during the year. The estimate was honestly made and convinced Munroe that about $350,000 would be accumulated unless it was distributed. This figure was arrived at by eliminating one-tenth of the gain from the Laclede sale, which the Commissioner had insisted was income of 1927 rather than income of 1929 as shown on the books. That left earnings of about $560,000. It was known that the petitioner had agreed to pay the large deficiency for 1927, interest would have to be paid on that deficiency, and the interest accruing during 1929 would amount to about $120,000. It was also known that lawyers' fees in the amount of $16,666.66 had been incurred in 1929 in connection with the tax controversy and would have to be paid. The taxes for 1929 were estimated at about $61,000. Munroe believed that all of those obligations were proper charges against 1929 earnings in determining the amount of those earnings available for distribution. It was estimated that the securities of the petitioner had depreciated in value to the extent of about $90,000. Munroe thought that allowance would have to be made for that shrinkage in determining the amount of 1929 earnings available for distribution as a dividend. He concluded that a distribution of $350,000 would be proper, would represent a complete distribution of the "gains and profits" for the year, would permit none of those "gains and profits" to accumulate, and, therefore, would relieve the corporation from all possibility of tax liability under section 104. It now appears, as shown in the preceding paragraph, that the correct amount of "gains and profits" was somewhat in excess of his estimate. The fact that his estimate later turned out to be erroneous is not so important as the fact that it was honestly made in an effort to distribute the earnings of the petitioner as Munroe saw them. The errors which were made were not inexcusable ones. The evidence as a whole indicates that Munroe did not want to take any chances on the application of section 104, but intended to distribute all of the available "gains and profits" of the petitioner for 1929 and to permit none of those "gains and profits" to accumulate. Such an intent is inconsistent with a purpose to avail of the petitioner to avoid surtax upon Munroe through the medium of permitting its "gains and profits" to accumulate.

Munroe filed a return for himself showing a loss and if he had had the matter in mind, he would have thought that his return could absorb tax-free even larger distributions from the petitioner. But apparently he was not thinking so much of the tax significance of the distribution to himself as he was of its importance to the corporation. The record does not support the respondent's claim that the amount of the dividend was fixed so that Munroe would not have any tax to pay. The figures used in the estimate, as well as other evidence in the record, corroborate Munroe's testimony that he had no purpose to avail of the petitioner in 1929 to avoid surtaxes upon himself through the medium of permitting its gains and profits to accumulate instead of being distributed. Furthermore, a "large portion of its earnings for the year in question" were distributed, a fact which also negatives intent to avoid surtaxes and brings the petitioner within Article 542 of Regulations 74, to the effect that the presumption of section 104 (c) is thus overcome.

The importance of the 1922 and 1923 contracts has been discussed already and merits no further mention. The fact that Munroe in 1929 discharged indebtedness to the petitioner by transfer of securities and thereby sustained deductible losses seems to have little or no significance for present purposes. The reorganization, which occurred in 1930, does not have any bearing whatsoever upon the present question, even though the Board has held that it was a nontaxable reorganization. *C. A. Munroe, supra.* The loans to Munroe in 1929 and those made in prior years do not show a purpose within section 104. They did not weaken the financial position of the petitioner and they were not disguised dividends of the earnings of the corporation. Cf. *Helvering* v. *National Grocery Co.,* 304 U. S. 282; *United Business Corporation, supra; William C. deMille Productions, Inc.,* 30 B. T. A. 826; *A. D. Saenger, Inc.,* 33 B. T. A. 135; affd., 84 Fed. (2d) 23; certiorari denied, 299 U. S. 577. Munroe gave his notes for the amount of the loans, paid the interest in full, and paid the principal. There is every indication that he at all times intended to pay them. Cf. *Charleston Lumber Co.* v. *United States,* 20 Fed. Supp. 83; *United States* v. *Tway Coal Sales Co.,* 75 Fed. (2d) 336. The petitioner had substantial income from the loans to Munroe, particularly in the year 1929. Furthermore, Munroe made loans to the petitioner and the latter was indebted to him for a large amount under the contracts. We can not find in the loan situation any purpose to avoid surtax upon Munroe by permitting the gains and profits of 1929 to accumulate.

The petitioner made its greatest profit from the sale of the Laclede stock in 1927. It attempted to spread the tax from that transaction over a period of ten years by taking Munroe's notes for the purchase price. It was not, however, a scheme to avoid taxes. Neither does

it demonstrate any purpose within section 104 applicable to the year 1929. The Commissioner has refused to consider any of that gain as gain for 1929.

Both parties gave considerable time and thought to the trial and briefing of this case. All of the evidence and all arguments presented have been carefully considered in an effort to determine correctly whether section 104 applies. This opinion would be entirely too long were it to contain a detailed discussion of all of the many points argued. We have concluded upon the entire record that section 104 does not apply.

Reviewed by the Board.

*Decision will be entered under Rule 50.*

---

OPPER, dissenting: While the section which is being resisted is penal in its nature,[1] the evil Congress intended to restrict by its enactment is clearly recognizable,[2] and one may assume that the application of the statute was intended so that it would be effective for the purposes for which it was designed. See *Foster* v. *United States*, 303 U. S. 118. What was within the manifest intention of the legislative body should be considered as much a part of legislation as what is included in its express terms. *Helvering* v. *New York Trust Co.*, 292 U. S. 455. And this rule does not yield to any effort to make the statute bear less heavily upon those subject to its operation. *Helvering* v. *Stockholms Enskilda Bank*, 293 U. S. 84.

This is not to say that a technical construction of the section will fail to sustain respondent's position in this case, but merely that overlooking the main purpose of the provision so that we permit ourselves to be lost in a maze of detail will more easily result in an erroneous conclusion. The purpose of section 104 clearly was to penalize the intentional avoidance of surtaxes upon individuals by the intervention of corporations. Congressional Record, vol. 50, part VI, p. 5319. That precise result has been accomplished by the use of this petitioner. Since the conclusion that the section does not reach this case is at war with its evident purpose, only an unmistakable prohibition in the language of the act itself should preclude its application.

Petitioner's sole stockholder succeeded from 1922 to 1929 in escaping all individual income tax on the earnings of the securities he transferred to petitioner.[3] This was the direct result of the plan disclosed by the present facts. It is not unreasonable to assume that

---

[1] See *Helvering* v. *Mitchell*, 303 U. S. 391, 405.

[2] *Mead Corporation*, 38 B. T. A. 687, 700.

[3] Petitioner is obviously giving expression to a misconception when it says in its brief: "But there is no proof in this case of minimizing taxes. The record shows that with the exception of a small profit in 1923 ($5,264.95) the company had net losses for the first

a result so clear and inevitable was also a purpose, at least in the absence of countervailing proof. *R. L. Blaffer & Co.*, 37 B. T. A. 851; affd., 103 Fed. (2d) 487 (C. C. A., 5th Cir.) ; certiorari denied, 308 U. S. 576. He was enabled to accomplish this purpose by three elements in the plan: First, the creation of petitioner; second, the terms of the security transfers; and third, the failure to mesh the corporation's accrual method with the individual's cash basis. Because all three parts of the plan were necessary to enable the shareholder to escape surtax, it does not follow that the corporation was not formed for that inhibited purpose. Its formation was as much an integral and essential part of the scheme as either of the other elements. And because that was not its only purpose it does not follow that the impact of the section is averted. *R. L. Blaffer & Co.*, *supra.*

Petitioner must, therefore, it seems to me, be regarded as having been formed for the purpose of avoiding the imposition of surtax upon its shareholder, a result which so far brings the situation meticulously within the most technical reading of the first portion of the section. The majority opinion does not take a contrary view, but rejects the conclusion that this was to be done by permitting the gains and profits of petitioner to accumulate instead of being divided or distributed. That depends upon how we define the words "gains and profits" as used in section 104. There is no express limitation to "net" gains and profits.[4] Whether the provision must be restricted to such net gains in the ordinary and natural application

---

five years of its existence (Exhibit 38). During that same period Munroe's net income was less than the losses sustained by the corporation (Exhibit 39). It follows, therefore, that if he had made the transactions which were made by the corporation and sustained the same losses, all his income for those years would have been wiped out, and he would have had large net losses to carry forward."

The "net losses" to which petitioner refers were those taken for income tax purposes. They were evidently arrived at by deducting from gross income the accrued "liabilities" consisting not only of all of the income received on the securities contributed by Munroe, but of 20 per cent thereof in addition, or of 7 per cent interest on the proceeds of sales. Naturally these accruals could not have been deducted by Monroe if he had been receiving the income and reporting it for tax purposes. And of course the larger the income from these securities and the smaller the petitioner's income from other sources, the greater would be its net loss, since the receipt of income from that source required it to accrue as a "liability" a greater amount than the income received.

For example, petitioner's tax return for the calendar year 1925 shows a gross income of $179,442.17. Of this $114,346.30 is income from interest and dividends and only $14,554.84 is gross profit from its operations. The balance represents capital gains. Against this, in addition to the offsetting deduction for dividends from domestic corporations, it deducted $141,892.99 as "interest." It was thus enabled to show a "net loss", but its dividend and interest income was eight times as great as its operating income. If the bulk of this came from the securities contributed by Munroe or their proceeds, which seems certain, it is manifest that Munroe's net income for 1925 of $32,024.06 would have been augmented three or four times over for surtax purposes if he had retained the securities instead of transferring them to petitioner.

[4] See Revenue Act, 1928, section 22 (a), where "gains" and "profits" are used in the definition of gross income. *Cf. G. B. R. Oil Co.*, 40 B. T. A. 738 dealing with the term "earnings and profits."

of the section need not be considered. Clearly petitioner here had gains and profits before it set off against them the corresponding accrued liabilities to its shareholder. It seems obvious that Congress could not have intended the term "gains and profits", whether net or gross, to mean those resulting from an artificial calculation pursuant to a clever device for frustrating the fundamental purpose of the very provision in which the term appears. Cf. *Gregory* v. *Helvering*, 293 U. S. 465. It requires no more penetration than it did in that case to conclude that the organization of petitioner and its accrual of these "expenses" was a mere "disguise for concealing its real character and the sole object and accomplishment of which was the consummation of a preconceived plan * * *. To hold otherwise would be to exalt artifice above reality and to deprive the statutory provision in question of all serious purpose." (Pp. 469, 470.)

But for the ingenious terms of the contracts there would have been no such accrued "expenses." Without the accruals there would clearly have been gains and profits in the strictest sense. The contracts pursuant to which petitioner made book entries purporting to offset these gains and profits with "debts" to the shareholder were an integral part of the very scheme by which the shareholder was to avoid surtax. Moreover, these gains and profits were permitted—in fact, under the plan of petitioner's organization, were required— to be accumulated instead of being divided or distributed. That the ultimate division or distribution—the payment for contributed capital—would be in the bookkeeping form of compensation rather than dividends can not change the actuality of the gains and profits, or the fact of their accumulation. See *Foster* v. *United States, supra.* Viewed from the standpoint of reality, this corporation was formed, whether or not it was also availed of,[5] for the very purpose which the intent and a fair construction of the language of section 104 will easily cover. We should not permit a long and roundabout path to lead to a different place from the one to which the straight path would take us. *Minnesota Tea Co.* v. *Helvering*, 302 U. S. 609.

I am of the opinion that respondent properly sought to apply section 104 to this petitioner.

SMITH, STERNHAGEN, TURNER, ARNOLD, and HARRON agree with this dissent.

---

[5] See *Reynard Corporation,* 37 B. T. A. 552, 562.