The Eastern Machinery Company v. Commissioner.
Eastern Mach. Co. v. Commissioner
Docket No. 27371.
United States Tax Court
1951 Tax Ct. Memo LEXIS 58; 10 T.C.M. (CCH) 1031; T.C.M. (RIA) 51321; October 26, 1951
*58 As of September 30, 1946, petitioner had an accumulated surplus of $842,983.60. During its fiscal year ended September 30, 1947, it had a net income of $211,328.02. Petitioner paid out $80,304.65 for Federal taxes, $5,250 in dividends and placed $125,000 in a surplus reserve for renegotiation liabilities. Respondent determined that petitioner overpaid its normal tax and surtax in the amount of $2,744.56. He also determined petitioner to be subject to the provisions of section 102, I.R.C., and for that purpose to have an undistributed net income of $121,295.41. Held: Petitioner was not availed of, in the fiscal year ended September 30, 1947, for the purpose of preventing the imposition of surtax on its stockholders by permitting gains and profits for that year to accumulate beyond the reasonable needs of the business. Elden McFarland, Esq., 618 Southern Bldg., Washington, D.C., and C. Chester Guy, Esq., for the petitioner. Hugh F. Culverhouse, Esq., for the respondent. VAN FOSSAN Memorandum Findings of Fact and Opinion Petitioner contests a deficiency in income taxes for the fiscal year ended September 30, 1947, in the amount of $32,954.17. Petitioner also claims overpayment of its *59 normal tax and surtax for that year in the amount of $2,744.56 as computed in the notice of deficiency. The sole issue presented is whether petitioner was availed of for the purpose of preventing the imposition of surtax upon its shareholders by permitting gains and profits for the fiscal year ending September 30, 1947, to accumulate beyond the reasonable needs of the business. Findings of Fact Petitioner is an Ohio corporation having its principal office at Cincinnati, Ohio. It was incorporated on September 22, 1925. Since that date it has engaged exclusively in the business of purchasing, reconditioning and selling used machinery and machine tools. Its corporate income tax return for the year under review was filed with the collector of internal revenue for the first district of Ohio. During the taxable year petitioner had 5,250 shares of capital stock outstanding. Of this total amount Fred Bierbaum and George Bierbaum each owned 2,622 shares, and Charles Bierbaum and Robert Bierbaum each owned three shares. There were no other stockholders. As of September 30, 1940, the paid-in capital of the petitioner was represented by $175,000 of capital stock outstanding, all of which had *60 been paid for in cash. In March, 1941, the petitioner declared a stock dividend of 200 per cent of all capital stock outstanding, and an amount of $350,000 was transferred from the surplus account to the capital account. For the years ended September 30, 1939, through and including the year ended September 30, 1947, petitioner's net income before Federal taxes, earnings accumulated at the end of the year, dividends paid, cash balance plus United States obligations owned at the end of the year, and inventory at the end of the year, were as follows: Cash Balance
Net Income
Accumulated
Plus U.S. Obli-
Inventory
Yr. Ended
Before Fed-
Earnings at
Dividends
gations Owned
at End
Sept. 30
eral Taxes
End of Year *
Paid
at End of Year
of Year
1939
$ 10,807.46
$ 78,839.99
$ 1,500.00
$ 28,180.01
$145,820.00
1940
582,874.45
657,648.11
3,500.00
417,830.80
201,825.00
1941
469,985.15
820,771.46
36,750.00
639,296.17
265,180.00
1942
632,829.42
1,079,459.61
36,750.00
1,071,231.19
208,826.11
1943
223,951.45
1,176,647.84
36,750.00
842,861.06
383,457.03
1944
34,676.67
1,180,827.19
26,250.00
918,435.09
277,565.66
1945
22,035.69
1,191,722.53
5,250.00
963,412.04
359,584.44
1946
142,498.98
1,192,983.60
5,250.00
913,782.19
355,071.80
1947
211,328.02
1,318,756.97
5,250.00
806,129.60
528,059.20
*61 Condensed balance sheets of petitioner, as of the end of each of its fiscal years 1943, 1946, and 1947, are as follows: 9-30-43
9-30-46
9-30-47
ASSETS
Cash
$ 674,111.06
$ 865,032.19
$ 757,379.60
Notes Receivable
Accounts Receivable
88,244.92
95,146.45
143,784.25
Accounts Receivable (Government withheld)
48,277.97
Inventories
383,457.03
355,071.80
528,059.20
U.S. Government Securities
168,750.00
48,750.00
48,750.00
Plant Assets
266,676.28
62,060.06
62,086.08
Less: Reserve for Depreciation
117,194.27
24,619.85
21,571.16
Net Plant Assets
$ 149,482.01
$ 37,440.21
$ 40,514.92
Leasehold Improvements
Federal Tax Claim
43,023.68
43,023.68
$1,464,045.02
$1,444,464.33
$1,609,789.62
LIABILITIES
Notes Payable
Accounts Payable
22,506.60
21,612.76
35,728.00
Federal Tax Accrual
89,580.58
54,867.97
80,304.65
Other Liabilities
310.00
Reserve for Renegotiations
125,000.00
Capital Stock
525,000.00
525,000.00
525,000.00
Surplus
826,647.84
842,983.60
843,756.97
$1,464,045.02
$1,444,464.33
$1,609,789.62
*62 Petitioner's profit and loss statements for the years ended September 30, 1946, and 1947, as shown by its income tax returns, are as follows: 9-30-46
9-30-47
Gross Sales
$1,015,292.66
$1,010,859.10
Cost of Goods
681,254.86
643,520.52
Gross Profit
334,037.80
367,338.58
Interest
5,788.64
1,864.42
Discounts
167.27
Commissions
11,242.99
Total Income
$ 339,826.44
$ 380,613.26
Officers Salaries
$ 120,600.00
$ 120,600.00
Rent
Interest
29,062.04
Taxes
9,985.33
12,077.36
Depreciation
1,849.17
4,500.00
Amortization of War
Facilities
Advertising
23,879.20
Other Deductions
35,830.92
8,228.19
Total Expenses
197,327.46
168,285.24
NET INCOME
$ 142,498.98
$ 211,328.02 The net income shown above for 1946 was utilized to defray Federal tax deficiencies for prior years in the amount of $124,143.62. Based upon the above figures, petitioner's working capital as at September 30, 1946, was: Current Assets
Cash
$ 865,032.19
Notes and Accounts
Receivable
95,146.45
Inventories
[1] *63 355,071.80
U.S. Government
48,750.00
Total Current As-
sets
$1,364,000.44
Current Liabilities
Accounts Payable
$ 21,612.76
Federal Tax Accrual
54,867.97
Total Current Lia-
bilities
$ 76,480.73
Working Capital
$1,287,519.71
During the fiscal year ended September 30, 1947, petitioner's accumulated earnings were increased by the current year's earnings of $211,328.02 and decreased by dividends paid of $5,250, Federal taxes paid $80,304.65, and $125,000 placed in a surplus reserve for renegotiation liabilities. The net taxable income was $204,105.50 upon which its normal tax and surtax liability was $77,560.09. Its undistributed section 102 net income was $121,295.41. Petitioner overpaid its normal tax and surtax by the amount of $2,744.65. As a result of its operations during the taxable year, petitioner's working capital based upon the above figures as at September 30, 1947, was: Current Assets
9-30-47
Cash
$ 757,379.60
Notes and Accounts
Receivable
143,784.25
Accounts Receivable
(Government with-
held)
[2] 48,277.97
Inventories
[1] *64 528,059.20
U.S. Government
Securities
48,750.00
Total Current As-
sets
$1,526,251.02
Current Liabilities
Accounts Payable
35,728.00
Federal Tax Ac-
crual
80,304.65
Total Current Lia-
bilities
$ 116,032.65
Working Capital
$1,410,218.37
The renegotiation reserve of $125,000 was set up to cover a contingent liability growing out of such contested determinations involving the fiscal years 1942 and 1943. The net amounts involved totaled approximately $137,000. Petitioner was advised of its potential liability therefor in 1943 when legislation providing for such renegotiation was passed. This potential liability was one factor taken into account thereafter by its board of directors, when the advisability of declaring dividends was under consideration. Petitioner first came to a practical realization that this liability was real and genuine during the taxable year when it was advised of the general trend of renegotiation proceedings. The setting up of the reserve was thereupon authorized by its directors on September 15, 1947. Thereafter the proceedings were decided adversely to petitioner and the full amounts in dispute, together with 6 per cent interest thereon, were paid. During *65 the year 1947 a great amount of used machinery was being sold under the auspices of the War Assets Administration. This presented an unusual opportunity to buy much machinery at low prices. Within the taxable year petitioner expended $590,000 for such used machinery. These were cash transactions. As a result thereof petitioner's cash on hand decreased in the amount of $107,652.59, and its inventory increased in the amount of $172,987.40 to $528,059.20, the highest since its organization. Petitioner had endeavored to purchase more and at the end of its fiscal year 1947 had outstanding bids with the War Assets Administration totaling $550,000. A deposit of $110,000, or 20 per cent, had been placed thereon and it was committed to pay the balance of $440,000 should its offers be accepted. In addition to this amount petitioner would have to bear the expense of moving the heavy machinery from various places in the United States. Petitioner was also faced with the necessity of reconditioning the machinery so purchased and with the possible requirement of converting to peacetime uses. This process was estimated to take about four years with a cost of approximately $900,000. Petitioner's business *66 is hazardous, very speculative and highly competitive. Because of the nature of its business, commercial bank loans are not available to petitioner in times when used machinery is available for purchase. Its purchases generally require cash payment. Petitioner keeps its cash on hand in commercial bank deposits and its reputation for being able to make such cash payments has enabled it to conclude numerous profitable transactions. Petitioner has never borrowed money from banks. The only borrowings were on the personal insurance policies of its shareholders in 1926 and 1927. In his individual Federal income tax return for the year 1947, Fred Bierbaum, one of the two principal stockholders of petitioner, reported a net income of $58,800.56, upon which a tax of $31,601.24 was reflected. Had petitioner distributed its net income for the fiscal year ended September 30, 1947, to its stockholders, Fred Bierbaum, by reason of receipt of such dividend, would have paid a tax in the sum of $79,371.96, or an amount of $47,770.72 greater than the amount actually reflected on his return as filed. The other principal stockholder of petitioner, George Bierbaum, in his individual Federal income tax *67 return for the year 1947, reported a net income of $46,108.65, upon which a tax of $22,817.32 was reflected. Had petitioner distributed its net income of the fiscal year ended September 30, 1947, to its stockholders, George Bierbaum, by reason of receipt of such dividend, would have paid a tax in the sum of $68,640.95, or an amount of $45,823.63 greater than the amount actually reflected on his return as filed. We make the following additional ultimate findings: Petitioner did not permit its earnings for its fiscal year 1947 to accumulate beyond the reasonable needs of the business. Petitioner was not availed of during its fiscal year 1947 for the purpose of preventing the imposition of surtax upon its shareholders, through the medium of permitting its earnings to accumulate. Opinion VAN FOSSAN, Judge: The sole issue here is whether petitioner was availed of during its fiscal year ended September 30, 1947, for the purpose of preventing the imposition of surtax upon its stockholders by permitting its gains and profits to accumulate beyond its reasonable business needs, and is to be subjected to the provisions of section 102, Internal Revenue Code . [3] *68 *69 The pertinent provision of the Code is highly penal in character. Mead Corporation v. Commissioner, 116 Fed. (2d) 187. It is intended to curtail tax avoidance and loss of revenue occasioned by unlimited accumulation of corporate earnings and profits. On the other hand, it does not contemplate that a business should remain static nor does it proscribe an accumulation that is dictated by sound business judgment. See William C. De Mille Productions, Inc., 30 B.T.A. 826. The penalty surtax was not meant to be imposed upon a corporation because it failed to distribute a surplus accumulated in prior years. United Business Corporation of America, 33 B.T.A. 83; Corporate Investment Company, 40 B.T.A. 1156, at 1171; and Charleston Lumber Company v. United States, 20 Fed. Supp. 83. Rather, it is applicable only to the case where there has been an accumulation during the taxable year of that year's current earnings and profits in excess of the reasonable needs of the business, the purpose *70 being to avoid the levying of a surtax upon the shareholders. An excessive accumulation in the taxable year is determinative of the interdicted purpose unless the contrary is proven by a "* * * clear preponderance of the evidence * * *." Section 102 (c), supra. Therefore, the crucial question that first emerges is whether the taxpayer has allowed such an accumulation. What constitutes the reasonable needs of a business is purely a question of fact to be determined with reference to the extenuating circumstances peculiar to each particular case. Those needs which may be reasonable in one instance are not necessarily so in another situation. William C. DeMille Productions, Inc., supra. In the instant case petitioner is engaged in the financially hazardous and highly competitive business of dealing in used machinery. At the beginning of the taxable year it had a surplus of $842,983.60. For that year it had earnings and profits of $211,328.02, with a net taxable income of $204,105.50. Petitioner paid dividends in the amount of $5,250, Federal taxes in the amount of $80,304.65, [4] and set aside $125,000 as a reserve against renegotiation liabilities. There remained $773.37 of undistributed *71 current earnings and profits. Respondent has determined that there was no reasonable need, during the taxable year, to add to the above surplus; that petitioner is subject to the penalty surtax; and that it had an undistributed section 102 net income of $121,295.41. At the trial several joint exhibits were put in evidence. Respondent, on brief, has computed therefrom various tables and statements showing petitioner's working capital and ratio of current assets to current liabilities both at the beginning and end of the year before us. In making these computations respondent has added the $125,000 renegotiation reserve to the accumulated surplus at the end of the taxable year. As his reason for doing so, he contends that such reserve was totally unnecessary and unreasonable. Thus the limited issue here presented appears to be the narrow question as to whether this renegotiation reserve was necessary and justified from a sound business viewpoint. Respondent contends that his computations, along with the documentary evidence presented, refute the reasonable necessity for such a reserve. *72 And he urges that we accept these computations in lieu of the testimony of petitioner's directors and its banker. While the testimony of interested witnesses is not conclusive, absent unusual circumstances, it is not to be totally disregarded. The statute contemplates a practical rather than a theoretical approach to the question of what are the reasonable needs of the business. See C. H. Spitzner & Son, Inc., 37 B.T.A. 511, 517. Where, as here, a corporation is engaged in a hazardous business, we might well hesitate before substituting our opinion, or that of the respondent, for the sound and experienced judgment of the directors as to what constitutes such corporate needs. Dill Manufacturing Company, 39 B.T.A. 1023. However, respondent points out the fact that petitioner had been appraised of its potential renegotiation liability since June 30, 1943, and that that had been one factor taken into account in determining petitioner's dividend policy thereafter. Furthermore, he asserts on brief that the Government had withheld $48,277.97 of the amount due petitioner pending the outcome of its renegotiation proceedings. Therefore, he argues, there existed no reasonable necessity for *73 establishing the reserve inasmuch as ample provision had already been made for such liability. We are unable to agree with respondent's argument. The evidence before us shows that for the five-year period, 1943 to 1947, inclusive, unless the $125,000 item be included, the total increase in petitioner's surplus was $17,109.13. Certainly this was an inadequate amount with which to retire a potential liability of $137,000 because of renegotiation. This is particularly true when we note that interest was payable upon the full liability. We also note that the amount fixed for the renegotiation reserve approximated the amount later actually paid. As for the $48,277.97 which respondent claims was applicable against such liability, the record merely shows that this amount was due petitioner and that it had been withheld by the Government. Even though it might be said that both parties on brief assumed the purpose for the withholding, the evidence affords us no basis for making such an assumption. On the record we believe petitioner was fully justified in setting up the renegotiation reserve and that the amount so set apart was reasonable. Moreover, the taxable year had presented petitioner *74 with the unusual opportunity to acquire abundance of surplus used war machinery. Submission of bids, together with a cash payment of approximately 20 per cent, was the necessary first step toward effecting such purchases. Then, upon acceptance of a particular bid, the balance became payable in cash. During the year ended September 30, 1947, petitioner expended approximately $590,000 to acquire machinery in this manner, making a net increase in inventory of $172,000. As of that date it had bids, accompanied by cash payments aggregating $110,000, outstanding for more purchases in the total amount of approximately $550,000, with approximately $440,000 left to be paid if the bids were accepted. In addition, there would be freight and handling charges, plus the cost of possibly converting the machinery purchased to peacetime uses. True, there may have been a slight possibility that all of the bids would be accepted. But the fact remained that petitioner was committed and there was no way of knowing how much less its ultimate obligation might be. These bids and the money to cover them represented reasonable needs of the business. After a painstaking study of the record made in the light *75 of the surrounding circumstances known then to exist, we do not think that petitioner accumulated its earnings and profits beyond its reasonable business needs. Petitioner was planning its future on a broad and extensive scale. The financing of these plans involved large sums of money. We are convinced that the accumulation was dictated by sound business judgment and that there did not exist the purpose proscribed by section 102, supra. Accordingly, respondent's determination is reversed. Decision will be entered under Rule 50. Footnotes
*. For the years ended September 30, 1941, through and including September 30, 1946, there has been added to the surplus as shown on petitioner's Federal income tax returns the $350,000 stock dividend transferred from surplus to capital account in March 1941. For the year ended September 30, 1947, there has been added to surplus as shown by petitioner's Federal tax return for that year such $350,000 and the $125,000 book entry of a reserve for renegotiations.↩
1. Current assets have been defined as "* * * those assets which in ordinary course of business can or will be turned into cash within a brief period (not exceeding a year, normally) without diminution in value and without disrupting the organization. * * *" See Gerstenberg, Financial Organization and Management of Business, p. 440. While there is some evidence that petitioner's inventory was not in its entirety in an immediate salable condition, there is no evidence indicating the amount thereof.
2. While both parties appear to assume on brief that the funds so withheld by the Government were applicable to petitioner's renegotiation liability and were withheld for this purpose, there is nothing in the record so indicating.↩
1. See Footnote 1 above. 3. Sec. 102. Surtax on Corporations Improperly Accumulating Surplus. (a) Imposition of Tax. - There shall be levied, collected, and paid for each taxable year (in addition to other taxes imposed by this chapter) upon the net income of every corporation (other than a personal holding company as defined in section 501 or a foreign personal holding company as defined in Supplement P) if such corporation, however created or organized, is formed or availed of for the purpose of preventing the imposition of the surtax upon its shareholders or the shareholders of any other corporation, through the medium of permitting earnings or profits to accumulate instead of being divided or distributed, a surtax equal to the sum of the following: 27 1/2 per centum of the amount of the undistributed section 102 net income not in excess of $100,000, plus 38 1/2 per centum of the undistributed section 102 net income in excess of $100,000. (b) Prima Facie Evidence. - The fact that any corporation is a mere holding or investment company shall be prima facie evidence of a purpose to avoid surtax upon shareholders. (c) Evidence Determinative of Purpose. - The fact that the earnings or profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid surtax upon shareholders unless the corporation by the clear preponderance of the evidence shall prove to the contrary.
4. Respondent determined that this amount was $2,744.56 in excess of petitioner's correct tax liability.↩