GPD, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4747–71.   Filed June 26, 1973.

*Paul R. Trigg, Donald S. Young*, and *Joel J. Morris*, for the petitioner.

*Ralph F. Keister* and *Chauncy W. Tuttle, Jr.*, for the respondent.

SCOTT, *Judge:* Respondent determined deficiencies in petitioner's Federal income taxes for the years and in the amounts as follows:

| Year | Amount |
| --- | --- |
| 1967 | $79, 416. 93 |
| 1968 | 84, 593. 87 |

The issue for decision is whether for each of the years 1967 and 1968 petitioner is subject to the accumulated-earnings tax imposed by section 531, I.R.C. 1954,[1] because of being availed of for the purpose of avoiding income taxes with respect to its shareholders by permitting earnings and profits to accumulate instead of being divided or distributed.

FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

GPD, Inc. (hereinafter referred to as petitioner), is a corporation organized and existing under the laws of the State of Michigan. At the time of the filing of the petition herein, petitioner's principal place of business was located at Ferndale, Mich. Petitioner filed its Federal income tax returns for the calendar years 1967 and 1968 with the district director of internal revenue, Detroit, Mich.

---

[1] All references are to the Internal Revenue Code of 1954.

Petitioner was incorporated on February 10, 1954, and since that date has engaged in the sale and distribution of automotive parts in the States of Michigan and Ohio.

Since its incorporation, Emmet E. Tracy (hereinafter referred to as Tracy) has been petitioner's president and principal stockholder. Tracy has never received compensation for services as an officer of petitioner. From 1959 through 1971 petitioner's board of directors was composed of Tracy, Emmet E. Tracy, Jr., and Paul R. Trigg, Jr. From the date of its incorporation until November 13, 1967, petitioner's only authorized stock consisted of 50,000 shares of common having a par value of $1. On October 31, 1967, petitioner's articles of incorporation were amended to authorize 50,000 shares of preferred stock having a par value of $1 per share and to reduce the authorized common stock to 25,000 shares without change in par value. On December 23, 1968, petitioner's board of directors authorized the issuance of 5,000 shares of $7 cumulative preferred stock, $1 par value, to Tracy, its then sole common stockholder as a dividend. As of December 31, 1971, Tracy had transferred 4,600 preferred shares to the Jesuit Seminary Guild of New England. He continued to hold 400 preferred shares in his own name.

The holders of petitioner's outstanding common stock at the close of its taxable years ended December 31, 1967, and December 31, 1968, were as follows:

| Stockholder | Number of shares held as of | |
| --- | --- | --- |
| | Dec. 31, 1967 | Dec. 31, 1968 |
| Emmet E. Tracy | 2,810 | 2,810 |
| Catholic Foreign Mission Society of America, Inc | 800 | |
| Guest House, Inc | 720 | |
| St. Mary's Catholic Church, Alma, Mich | 300 | |
| Total common shares outstanding | 4,630 | 2,810 |

Petitioner holds a franchise as the exclusive distributor of all Ford "genuine parts" except engines (which were supplied by the John Fisher Co. of Columbus, Ohio) in the Michigan-Ohio area. "Genuine parts" is a term used to identify new or rebuilt automotive parts manufactured or rebuilt by Ford Motor Co. or under its authority for sale to franchised distributors such as petitioner.

Petitioner is only a distributor and does not manufacture or rebuild parts. Most of petitioner's customers are Ford automobile dealers. Petitioner obtained its parts from the Ford Motor Co. and Alma Piston Co. which was an authorized manufacturer and rebuilder of Ford automobile parts.

Alma Piston Co. (hereinafter called APC) is a Michigan corporation with its principal place of business in Alma, Mich., and is wholly owned by Tracy, his wife, and their four adult children.

APC is engaged in manufacturing, rebuilding, and distributing automotive parts through four operating divisions and a wholly owned subsidiary. The Alma Products Division manufactures new parts and rebuilds used automobile parts. It manufactures parts primarily for Ford. However, during the years here in issue it rebuilt converters for General Motors upon receipt of purchase orders for this rebuilt part. These rebuilt converters were shipped to General Motors by common carrier. Originally it had been planned to send the parts to General Motors by truck but the volume turned out to be about one-fourth the anticipated volume so that shipment by common carrier was more economical.

Genuine Parts Distributor, Midwest (hereinafter called GPD, Midwest), is another division of APC which rebuilds "genuine parts" primarily for sale to petitioner. Genuine Parts Distributors, West Coast (hereinafter called GPD, West Coast), is another division of APC and it distributes "genuine parts" from its bases located in Los Angeles, San Francisco, Phoenix, and Salt Lake City.

Tomador Engine Co. (hereinafter called Tomador) of the City of Industry, Calif., was acquired by APC in 1968 and is operated as a division of APC. Tomador rebuilds automobile engines. It sells Ford engines through GPD, West Coast, and all other rebuilt engines to other distributors and jobbers. Snow Manufacturing Co. is a wholly owned subsidiary of APC which rebuilds automobile parts (except automobile engines).

The following schedule shows the comparative income statements for petitioner for the calendar years 1967 and 1968:

COMPARATIVE INCOME STATEMENTS—GPD, INC.

|  | 1967 | 1968 |
|---|---|---|
| Sales [1] | $2, 001, 605. 37 | $2, 285, 298. 05 |
| Cost of sales | 1, 231, 072. 97 | 1, 362, 959. 49 |
| Gross profit from sales | 770, 532. 40 | 922, 338. 56 |
| Warehouse expenses | 49, 735. 65 | 47, 963. 99 |
| Selling expenses | 147, 093. 20 | 168, 890. 29 |
| General and administrative expenses | 171, 010. 67 | 192, 517. 49 |
| Total expenses | 367, 839. 52 | 409, 371. 77 |
| Net income from sales | 402, 692. 88 | 512, 966. 79 |
| Other income | 99, 900. 42 | 85, 551. 02 |
| Other deductions (discounts) | 5, 956. 86 | 1, 908. 38 |
| Net income before taxes | 496, 636. 44 | 596, 609. 43 |
| Provision for Federal taxes | 247, 689. 57 | 317, 826. 40 |
| Net income after Federal taxes | 248, 946. 87 | 278, 783. 03 |

[1] Petitioner's sales figures reflected in the above schedule do not correspond with the sales figures ($2,033,946.42 in 1967 and $2,308,043.76 in 1968) and income figures ($530,388.75 in 1967 and $613,587.22 in 1968) reflected in petitioner's 1967 and 1968 income tax returns. However, the parties have stipulated the above figures which are derived from financial statements prepared from petitioner's books and records by independent certified public accountants retained by petitioner.

Comparative balance sheets of petitioner as of the close of its taxable years 1966, 1967, and 1968 are set forth in the following schedule:

COMPARATIVE BALANCE SHEETS—GPD, INC.

|  | 1966 | 1967 | 1968 |
|---|---|---|---|
| Current assets: |  |  |  |
| Cash | $614,019.54 | $797,363.32 | $415,784.85 |
| Accounts receivable | 199,856.11 | 225,202.35 | 237,557.36 |
| Inventories | 293,481.46 | 331,679.85 | 348,325.25 |
| Prepaid expenses | 8,764.77 | 9,453.49 | 10,645.80 |
| Total current assets | 1,116,121.88 | 1,363,699.01 | 1,012,313.26 |
| Fixed assets | 122,218.28 | 109,593.60 | 120,750.69 |
| Other assets | 0 | 8,560.69 | 30,343.40 |
| Total assets | 1,238,340.16 | 1,481,853.30 | 1,163,407.35 |
| Current liabilities: |  |  |  |
| Accounts payable | 171,163.25 | 130,433.45 | 86,702.16 |
| Customer deposits | 34,039.96 | 20,206.93 | 17,875.79 |
| Withholding taxes | 3,503.44 | 486.91 | 603.41 |
| Accrued: |  |  |  |
| Salaries | 1,350.30 | 2,724.12 | 2,307.20 |
| Payroll taxes | 1,173.42 | 239.15 | 252.46 |
| Other taxes | 6,100.00 | 8,862.92 | 23,446.65 |
| Federal income taxes | 94,446.41 | 189,689.57 | 126,126.40 |
| Total current liabilities | 311,776.78 | 352,643.05 | 257,314.07 |
| Other liabilities | 2,928.00 | 3,456.00 | 4,080.00 |
| Stockholder's equity: |  |  |  |
| Common stock | 4,630.00 | 4,630.00 | 4,630.00 |
| Preferred stock | 0 | 0 | 5,000.00 |
| Retained earnings | 919,005.38 | 1,121,124.25 | 1,326,843.28 |
| Less: Treasury stock (1,820 shares) | 0 | 0 | (434,460.00) |
| Total liabilities and equity | 1,238,340.16 | 1,481,853.30 | 1,163,407.35 |

The following schedule reflects petitioner's sales, net income before taxes, Federal taxes, net income after taxes, and dividends paid for the 10-year period 1959 through 1968:

| Year | Sales | Net income before taxes | Federal taxes | Net income after taxes | Cash dividends declared |
|---|---|---|---|---|---|
| 1959 | $1,245,700.90 | $159,879.62 | $77,535.93 | $82,343.69 | 0 |
| 1960 | 1,244,151.18 | 214,539.88 | 105,969.27 | 108,570.61 | 0 |
| 1961 | 1,221,304.46 | 183,161.53 | 90,136.35 | 93,025.18 | 0 |
| 1962 | 1,508,882.51 | 281,323.32 | 139,971.19 | 141,352.13 | 0 |
| 1963 | 1,559,311.63 | 245,443.10 | 121,882.34 | 123,560.76 | 0 |
| 1964 | 1,631,110.26 | 295,407.12 | 141,827.53 | 153,579.59 | 0 |
| 1965 | 1,719,754.75 | 397,077.89 | 184,867.05 | 212,210.84 | 0 |
| 1966 | 1,793,758.83 | 341,270.88 | 157,346.45 | 183,924.43 | 0 |
| 1967 | 2,001,605.37 | 496,636.44 | 247,689.57 | 248,946.87 | $46,300 |
| 1968 | 2,285,298.05 | 596,609.43 | 317,826.40 | 278,783.03 | 67,440 |

Petitioner's monthly inventory balances in 1967 and 1968 averaged $352,460.93 and $384,003.19, respectively. The average monthly accounts receivable balances in 1967 and 1968 were $227,952.79 and $254,487.92, respectively.

In 1963 Tracy contacted J. P. Hopkins, Parts and Accessories Manager of the Chevrolet Motor Division of General Motors Corp. (hereinafter called Chevrolet), concerning the possibility of supplying

Chevrolet with rebuilt carburetors, clutches, starters, and other Chevrolet parts. Discussions with Hopkins were discontinued because of the decision of Chevrolet's management to continue its policy of selling these parts only new.

Tracy resumed discussions with representatives of Chevrolet in 1968. In these discussions Tracy suggested that APC could rebuild automobile parts to supply to Chevrolet dealers. As a result of these discussions in the latter part of 1971, APC delivered to Chevrolet for testing two engines which had been rebuilt by Tomador. At the time of the trial of this case no decision had been made by Chevrolet whether to go into the sale of rebuilt engines. Investigation was under way at that time as to the economics of the program with particular reference to pricing and distribution.

United Motor Service is a division of General Motors Corp. (sometimes hereinafter called GM). This division markets GM parts through distributorships. The AC Division of General Motors manufactures certain fast-selling parts that fit all divisional products for sale by the United Motor Service division. General Motors dealers also distribute GM parts. These parts are secured by the dealers from a national network of 38 warehouses.

The only rebuilt parts handled by General Motors are generators, starter motors, and windshield wiper motors. These items are rebuilt for GM and distributed by United Motor Service.

It was not until about 1971 that the GM management became interested in rebuilt parts other than generators, starter motors, and windshield wiper motors. About 1967 Tracy discussed with representatives of Ford the possibility of petitioner's obtaining the franchise to distribute rebuilt engines and also the possibility of petitioner's obtaining the franchise to distribute "genuine parts" in the Chicago area. At the time of the trial of this case petitioner had not obtained either of these franchises.

In 1968 Tracy discussed with representatives of Maremount Co. the possibility of acquiring a portion of Maremount's rebuilding operations to produce rebuilt automotive parts. Tracy was suggesting that petitioner might acquire one of Maremount's four plants at an estimated cost of $1½ million to $2 million. However, Maremount was unwilling to sell the plants separately, and subsequently sold all four plants to Champion Parts Rebuilders, Inc.

A controversy over petitioner's Federal income tax liability for the taxable years 1964, 1965, and 1966 culminated in respondent's issuing petitioner a notice of deficiency on March 8, 1968, asserting deficiencies for the following years in the amounts indicated:

| Year | Amount |
|------|--------|
| 1964 | $48, 926. 41 |
| 1965 | 70, 461. 30 |
| 1966 | 64, 723. 77 |
| Total | 184, 111. 48 |

Emmet E. and Frances Tracy made charitable contributions which were deducted in computing their taxable income in the following amounts during the years 1958 through 1970.

| Year | Amount | Year | Amount |
|------|--------|------|--------|
| 1958 | $59, 300. 00 | 1965 | $108, 463. 50 |
| 1959 | 59, 611. 63 | 1966 | 123, 169. 00 |
| 1960 | 67, 945. 00 | 1967 | 128, 150. 14 |
| 1961 | 69, 270. 00 | 1968 | 128, 067. 00 |
| 1962 | 63, 300. 00 | 1969 | 127, 467. 00 |
| 1963 | 75, 000. 00 | 1970 | 112, 825. 00 |
| 1964 | 91, 147. 78 | | |
| | | Total | 1, 213, 716. 05 |

Included in these contributions are donations of petitioner's common stock which was valued at its book value in computing charitable deductions, the number of shares donated, the donees, and the amounts of the donations being shown in the following table:

| Year | Donee | Number of shares [1] | Amount |
|------|-------|---------------------|--------|
| 1959 | Catholic Foreign Mission | 1, 250 | $50, 000 |
| 1960 | Catholic Foreign Mission | 1, 200 | 60, 000 |
| 1961 | Catholic Foreign Mission | 900 | 59, 000 |
| 1962 | Catholic Foreign Mission | 700 | 60, 000 |
| 1963 | Catholic Foreign Mission | 300 | 29, 725 |
| | Jesuit Seminary Guild | 400 | 39, 600 |
| 1964 | Catholic Foreign Mission | 300 | 35, 000 |
| | Guest House | 400 | 50, 000 |
| 1965 | Catholic Foreign Mission | 320 | 51, 000 |
| | Guest House | 320 | 51, 000 |
| 1966 | Catholic Foreign Mission | 300 | 59, 000 |
| | St. Mary's Church | 300 | 59, 000 |
| 1967 | Catholic Foreign Mission | 500 | 125, 000 |
| 1968 | Jesuit Seminary Guild | 1, 250 | 125, 000 |
| 1969 | Jesuit Seminary Guild | 1, 250 | 125, 000 |
| 1970 | Jesuit Seminary Guild | 1, 100 | 110, 000 |
| Total contributions represented by stock donations | | | 1, 088, 325 |

[1] Common shares donated 1959 through 1967; preferred shares 1968 through 1970.

The redemptions of common stock made by petitioner from the various charitable organizations were as follows in the year indicated:

| Year | Charity | Number of shares redeemed | | Amount |
|------|---------|---------------------------|--|--------|
| 1961 | Catholic Foreign Mission | 2, 450 | | $127, 694. 00 |
| 1964 | Catholic Foreign Mission | 1, 900 | $191, 558 | |
| | Jesuit Seminary Guild | 400 | 40, 328 | 231, 886. 00 |
| 1966 | Catholic Foreign Mission | 620 | | 106, 197. 80 |
| 1968 | Catholic Foreign Mission | 800 | 190, 500 | |
| | Guest House, Inc. | 720 | 174, 960 | |
| | St. Mary's Church | 300 | 69, 000 | 434, 460. 00 |
| | | | | 900, 237. 80 |

The following schedule shows the amount of $7 preferred stock of GPD transferred by Tracy to the Jesuit Seminary Guild of New England from 1968 through 1971:

| Number of shares | Certificate No. | Date of transfer |
|---|---|---|
| 1,250 | 9 | Dec. 31, 1968 |
| 1,250 | 10 | Dec. 31, 1969 |
| 1,000 | 11 | Dec. 29, 1970 |
| 100 | 12 | Dec. 29, 1970 |
| 1,000 | 15 | Dec. 28, 1971 |

The Emmet and Frances Tracy Fund is an organization that makes contributions to charitable causes. The trustees of the Tracy Fund from 1959 through 1971 were Tracy, Frances Tracy (his wife), and Paul R. Trigg, Jr. The Tracy Fund is an organization exempt from income tax under section 501, contributions to which are deductible under section 170.

Petitioner and Alma Piston Co. made contributions which were fully deductible under the Internal Revenue Code to the Tracy Fund in the following amounts in the years indicated:

| Year | GPD—amount | APC—amount | Year | GPD—amount | APC—amount |
|---|---|---|---|---|---|
| 1958 | $5,000 | $50,000 | 1965 | $15,000 | $125,000 |
| 1959 | 5,000 | 50,000 | 1966 | 15,000 | 135,000 |
| 1960 | 10,000 | 70,000 | 1967 | 22,000 | 0 |
| 1961 | 10,000 | 50,000 | 1968 | 25,000 | 115,000 |
| 1962 | 12,500 | 70,000 | 1969 | 25,000 | 100,000 |
| 1963 | 12,500 | 83,000 | 1970 | 25,000 | 90,000 |
| 1964 | 15,000 | 100,000 | | | |
| | | | | 197,000 | 1,038,000 |

The following table shows, at the dates indicated (but without giving effect to the 1968 acquisition of its common stock by redemption from the various charitable organizations as constituting a distribution in whole or in part of earnings and profits), the petitioner's earnings and profits accumulated after February 28, 1913, within the meaning of sections 312 and 316:

| Date | Earnings and profits accumulated after 1913 |
|---|---|
| Dec. 31, 1966 | [1] $1,379,749.18 |
| Dec. 31, 1967 | 1,582,396.05 |
| Dec. 31, 1968 | 1,793,739.08 |

[1] The record does not adequately reflect whether the amount of earnings and profits as of Dec. 31, 1966, as stipulated by the parties was reduced by the $460,407.80 chargeable to earnings and profits for the common stock redeemed from 1961 through 1966. For purposes of our decision we shall assume that earnings and profits as of Dec. 31, 1966, as stipulated by the parties have been reduced for stock redemptions made by petitioner from 1961 through 1966.

The aggregate cost to petitioner for the acquisitions of its stock made prior to December 31, 1966, was $465,777.80 of which $5,370 was charged to the capital stock account and $460,407.80 was charged to the retained-earnings account. The remaining 1,820 shares of its common stock which petitioner acquired in 1968 at book value for a total

of $434,460 were held as treasury shares as of December 31, 1968. Of the $434,460 paid by petitioner for stock in 1968, $1,820 was chargeable to the capital stock account and $432,640 was chargeable to earnings and profits.

The joint Federal income tax returns filed by Tracy and his wife for 1967 and 1968 reported taxable income of $290,326.46 and $283,954.85, respectively, and a tax liability of $174, 208 and $182,478, respectively. If petitioner's after-tax income for 1967 had been entirely distributed, the income tax liability of Tracy and his wife would have increased to $248,098.82. The income tax liability of Tracy and his wife would have increased to $317,688.52 if the after-tax income of · petitioner had been entirely distributed as dividends in 1968.

On November 10, 1970, notification was sent by certified mail to petitioner, pursuant to section 534(b) informing petitioner of a proposed notice of deficiency for the taxable years 1967 and 1968 wherein there was included an amount with respect to accumulated-earnings tax imposed by section 531. Petitioner did not file a statement in response to that notification as is permitted under the provisions of section 534(c), setting forth the grounds on which it relies that all or part of its earnings and profits had not been permitted to accumulate beyond the reasonable needs of the business. On April 14, 1971, a notice of deficiency for the taxable years 1967 and 1968 was mailed to petitioner in which respondent determined that petitioner was liable for the accumulated-earnings tax under section 531 in the amounts of $79,416.93 and $84,593.87 for the taxable years 1967 and 1968, respectively.

OPINION

Section 531 imposes an accumulated-earnings tax on corporations described in section 532.[2]

---

[2] Secs. 531 through 535 and sec. 537, I.R.C. 1954, provide in part as follows:

SEC. 531. IMPOSITION OF ACCUMULATED EARNINGS TAX.

In addition to other taxes imposed by this chapter, there is hereby imposed for each taxable year on the accumulated taxable income (as defined in section 535) of every corporation described in section 532, an accumulated earnings tax equal to the sum of—

(1) 27½ percent of the accumulated taxable income not in excess of $100,000, plus
(2) 38½ percent of the accumulated taxable income in excess of $100,000.

SEC. 532. CORPORATIONS SUBJECT TO ACCUMULATED EARNINGS TAX.

(a) GENERAL RULE.—The accumulated earnings tax imposed by section 531 shall apply to every corporation (other than those described in subsection (b)) formed or availed of for the purpose of avoiding the income tax with respect to its shareholders or the shareholders of any other corporation, by permitting earnings and profits to accumulate instead of being divided or distributed.

* * * * * * *

SEC. 533. EVIDENCE OF PURPOSE TO AVOID INCOME TAX.

(a) UNREASONABLE ACCUMULATION DETERMINATIVE OF PURPOSE.—For purposes of section 532, the fact that the earnings and profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid

Section 532 provides that every corporation "formed or availed of for the purpose" of avoiding income tax as to its shareholders by permitting earnings and profits to accumulate rather than being divided or distributed shall be subject to the tax. Section 533 provides that the fact that earnings and profits are permitted to accumulate "beyond the reasonable needs of the business shall be determinative of the purpose to avoid the income tax" of its shareholders unless petitioner can prove to the contrary by a preponderance of the evidence; and section 537 defines the term "reasonable needs of the business" to include the "reasonably anticipated" needs of such business.

the income tax with respect to shareholders, unless the corporation by the preponderance of the evidence shall prove to the contrary.

\* \* \* \* \* \* \*

SEC. 534. BURDEN OF PROOF.

(a) GENERAL RULE.—In any proceeding before the Tax Court involving a notice of deficiency based in whole or in part on the allegation that all or any part of the earnings and profits have been permitted to accumulate beyond the reasonable needs of the business, the burden of proof with respect to such allegation shall—

(1) if notification has not been sent in accordance with subsection (b), be on the Secretary or his delegate, or

(2) if the taxpayer has submitted the statement described in subsection (c), be on the Secretary or his delegate with respect to the grounds set forth in such statement in accordance with the provisions of such subsection.

(b) NOTIFICATION BY SECRETARY.—Before mailing the notice of deficiency referred to in subsection (a) the Secretary or his delegate may send by certified mail or registered mail a notification informing the taxpayer that the proposed notice of deficiency includes an amount with respect to the accumulated earnings tax imposed by section 531. \* \* \*

(c) STATEMENT BY TAXPAYER.—Within such time (but not less than 30 days) after the mailing of the notification described in subsection (b) as the Secretary or his delegate may prescribe by regulations, the taxpayer may submit a statement of the grounds (together with facts sufficient to show the basis thereof) on which the taxpayer relies to establish that all or any part of the earnings and profits have not been permitted to accumulate beyond the reasonable needs of the business.

\* \* \* \* \* \* \*

SEC. 535. ACCUMULATED TAXABLE INCOME.

(a) DEFINITION.—For purposes of this subtitle, the term "accumulated taxable income" means the taxable income, adjusted in the manner provided in subsection (b), minus the sum of the dividends paid deduction (as defined in section 561) and the accumulated earnings credit (as defined in subsection (c)).

(b) ADJUSTMENTS TO TAXABLE INCOME.—For purposes of subsection (a), taxable income shall be adjusted as follows:

(1) TAXES.—There shall be allowed as a deduction Federal income and excess profits taxes \* \* \* accrued during the taxable year \* \* \*

\* \* \* \* \* \* \*

(c) ACCUMULATED EARNINGS CREDIT.—

(1) GENERAL RULE.—For purposes of subsection (a), in the case of a corporation \* \* \* the accumulated earnings credit is (A) an amount equal to such part of the earnings and profits for the taxable year as are retained for the reasonable needs of the business, \* \* \*

(2) MINIMUM CREDIT.—The credit allowable under paragraph (1) shall in no case be less than the amount by which $100,000 exceeds the accumulated earnings and profits of the corporation at the close of the preceding taxable year.

\* \* \* \* \* \* \*

SEC. 537. REASONABLE NEEDS OF THE BUSINESS.

For purposes of this part, the term "reasonable needs of the business" includes the reasonably anticipated needs of the business.

Petitioner's primary contention in this case is that its earnings and profits were accumulated for the reasonable needs, including the reasonably anticipated needs of its business. Petitioner further contends that in any event it is not subject to the accumulated-earnings tax for the year 1968 since because of its redemptions of stock charged to earnings in that year it had no increase in its accumulated earnings for the year 1968.

Since petitioner's alternative contention as to 1968 raises a strictly legal issue, we will consider it before reaching the factual issue in this case.

Section 312 [3] provides for a reduction in the earnings and profits of a corporation where there is a distribution in redemption except to the extent that such a distribution is chargeable to the capital account. In addition, section 316 [4] provides that any distribution made by a corporation to its shareholders shall be deemed to come first from most recently accumulated earnings and profits.

As shown by our findings, petitioner's increase in its earnings and profits from 1967 to 1968 without reduction of the 1968 earnings and profits by the $432,640 charged to earnings and profits because of its stock redemption, was $211,343.03. Therefore, applying the statutory rules set forth above to the redemption made by petitioner in 1968, it is clear that petitioner had no increase in earnings and profits in its taxable year 1968.

Respondent takes the position that an increase in earnings and profits during the taxable year is not a requirement for imposition of the accumulated-earnings tax. Respondent argues that where the evidence shows that a taxpayer was availed of for the purpose of avoid-

---

[3] SEC. 312. EFFECT ON EARNINGS AND PROFITS.

(a) GENERAL RULE.—Except as otherwise provided in this section, on the distribution of property by a corporation with respect to its stock, the earnings and profits of the corporation (to the extent thereof) shall be decreased by the sum of—
   (1) the amount of money,
   (2) the principal amount of the obligation of such corporation, and
   (3) the adjusted basis of the other property, so distributed.

\*       \*       \*       \*       \*       \*       \*

(e) SPECIAL RULE FOR PARTIAL LIQUIDATIONS AND CERTAIN REDEMPTIONS.—In the case of amounts distributed in partial liquidation (whether before, on, or after June 22, 1954) or in a redemption to which section 302(a) or 303 applies, the part of such distribution which is properly chargeable to capital account shall not be treated as a distribution of earnings and profits.

[4] SEC. 316. DIVIDEND DEFINED.

(a) GENERAL RULE.—For purposes of this subtitle, the term "dividend" means any distribution of property made by a corporation to its shareholders—
   (1) out of its earnings and profits accumulated after February 28, 1913, or
   (2) out of its earnings and profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made.

Except as otherwise provided in this subtitle, every distribution is made out of earnings and profits to the extent thereof, and from the most recently accumulated earnings and profits. \* \* \*

ing the income tax with respect to its shareholders a restrictive construction of the statute would thwart the legislative purpose for the accumulated-earnings tax. In support of his position, respondent argues that the tax is levied on the "accumulated taxable income" and not on the increase in "earnings and profits" and that in 1968 petitioner had "accumulated taxable income" as defined in section 535 even though it had no increase in "earnings and profits." [5]

Petitioner contends that although the accumulated-earnings tax is measured by a percentage of the "accumulated taxable income" and it had "accumulated taxable income" as defined in section 535 for the year 1968, under section 532 the accumulated-earnings tax is imposed only on corporations formed or availed of for the purpose of avoiding the income tax with respect to its shareholders "by permitting earnings and profits to accumulate instead of being divided or distributed." Petitioner argues that since it distributed all of its 1968 earnings and profits in redemption of stock, it did not permit "earnings and profits to accumulate instead of being * * * distributed" in that year. Petitioner contends that therefore under the plain language of section 532 it is not subject to the accumulated-earnings tax in 1968.

In support of its position, petitioner cites our holdings in *W. S. Farish & Co.*, 38 B.T.A. 150 (1938), affd. 104 F. 2d 833 (C.A. 5, 1939) ; *Corporate Investment Co.*, 40 B.T.A. 1156 (1939) ; *American Metal Products Corp.*, 34 T.C. 89 (1960), affd. 287 F. 2d 860 (C.A. 8, 1961). In each of these cases we held that a corporation which had no increase in its earnings and profits in a particular year was not formed or availed of in that year for the purpose of permitting its earnings and profits to accumulate instead of being distributed.

In *W. S. Farish & Co.*, *supra* at 158, we stated : "taxable net income is purely a statutory concept, and bears no necessary relation to gains and profits subject to distribution as dividends. * * * The proscribed act is the accumulation of 'gains and profits' and not 'net income' or 'taxable net income'." [6]

Respondent contends that the *Farish* case is distinguishable from the instant case since under our holding in that case the taxpayer had a deficit in earnings and profits.

In *Corporate Investment Co.*, *supra*, we held that the "gains and profits" referred to in the section of the tax law imposing accumulated-

---

[5] Respondent states that the $432,640 of the redemption price of the stock, though properly used to reduce earnings and profits for the year 1968, is not a deduction from accumulated taxable income under the provisions of section 535 since it is not a dividend as defined in section 561. Petitioner does not argue to the contrary of this statement.

[6] The term "gains and profits" appeared in the accumulated-earnings tax provisions until the adoption of the Revenue Act of 1936 when the term "earnings and profits" was substituted therefor. The change was not intended to change the existing law but merely to describe the fund from which dividends were paid. S. Rept. No. 2156, 74th Cong., 2d Sess., p. 17, 1939–1 C.B. (Part 2) 689.

earnings tax were the "gains and profits of the taxable year." In that case the taxpayer had substantial profits accumulated in years prior to the year there in issue. After discussing whether various items, including accruals of amounts due to the taxpayer's sole stockholder and interest thereon, should be used to reduce the current year's earnings and profits to such an extent that a distribution by the taxpayer to its shareholder eliminated most of the current year's earnings and profits, we stated (40 B.T.A. at 1172) :

the use of the words "to accumulate" instead of some such phrase as "to remain accumulated" is significant. Earnings of prior years may remain accumulated during the year but are not permitted "to accumulate" during that year. If Congress had intended to penalize the corporation for accumulating a surplus in prior years or for failing to distribute such a surplus in the taxable year, it would hardly have measured the penalty by the earnings of the current year or relieved the corporation from the penalty upon condition that the earnings of the current year were distributed to or reported by the stockholders. * * *
[Fn. omitted.]

In *American Metal Products Corp.*, *supra*, we held on facts very similar to the facts in the instant case that a corporation which had no increase in its earnings and profits for a certain year was not subject to the accumulated-earnings tax. In so holding we stated (34 T.C. at 104) :

With respect to the year 1953, the balance sheet of Adler Corporation reveals that the total of its surplus and surplus reserves as of the end of the year 1953 ($657,934.74) was less than the total amount of its surplus and surplus reserves as of the end of the preceding year ($658,398.66) and, accordingly, that there was no accumulation of "earnings or profits" by Adler Corporation during that year. This fact has not been called to our attention or discussed by either of the parties. It cannot, however, be ignored. As our findings indicate, this situation apparently resulted from the payment of an "Additional Federal tax" which, though nondeductible in determining the "section 102 net income" upon the basis of which the surtax would otherwise be computed (section 102(d) (1) (A) ), is nevertheless to be considered in determining whether the corporation was "availed of for the purpose of preventing the imposition of the surtax upon its shareholders * * * through the medium of permitting earnings or profits to accumulate instead of being divided or distributed." As was stated in *W. S. Farish & Co.*, 38 B.T.A. 150, 158, affd. 104 F. 2d 833, "taxable net income is purely a statutory concept and bears no necessary relation to gains and profits subject to distribution as dividends. * * * The proscribed act is the accumulation of 'gains and profits' and not 'net income' or 'taxable net income.' " Each year is to be considered separately, *W. S. Farish & Co., supra; Corporate Investment Co.,* 40 B.T.A. 1156, 1171. Under the circumstances presented herein, section 102 is not applicable to the Adler Corporation for the year 1953. [Fn. omitted.]

Respondent does not contend that the *Corporate Investment Co.* and *American Metal Products Corp.* cases are distinguishable from the instant case but rather contends that those cases were incorrectly decided and asks that we reconsider our holding in those cases, particu-

larly in light of the facts in the instant case. Respondent states that by managing the years in which he made gifts of petitioner's stock to charities and the years in which he had petitioner redeem that stock, Tracy, petitioner's major or sole stockholder, has been able to obtain not only the tax advantage of charitable deductions for himself far in excess of his base in the stock contributed to the charities but also if we follow our holding in *American Metal Products Corp.*, *supra*, to have petitioner avoid the accumulated-earnings tax by redeeming stock of a charity which is exempt from income tax on its gain from the redemption. In considering a similar argument in *Corporate Investment Co.*, *supra*, we stated at page 1171:

Although the contracts may have avoided or delayed tax on Munroe, they do not bring section 104 into play, since their use did not serve to avoid surtax on Munroe through the medium of permitting the gains and profits of this petitioner to accumulate instead of being distributed as taxable dividends to Munroe. Munroe may have been tax conscious and his contracts may have been cleverly drawn to save him from tax, but still this petitioner is not subject to tax under section 104 unless the facts are within the provisions of that section, which Congress has made so definite and specific.

The *Corporate Investment* opinion was reviewed by the Court and in a dissenting opinion, Judge Opper stated that whether the "gains and profits" referred to in the statute should in the ordinary case be considered the current year's net gain, "It seems obvious that Congress could not have intended the term 'gains and profits', whether net or gross, to mean those resulting from an artificial calculation pursuant to a clever device for frustrating the fundamental purpose of the very provision in which the term appears." Respondent's argument that if the reduction in the current year's earnings and profits was a part of a tax-avoidance plan, the lack of an increase in such earnings and profits in a particular year should not cause the corporation not to be subject to the accumulated-earnings tax, was considered and rejected by the Court in the *Corporate Investment Co.* case.

Respondent relies on the case of *Ostendorf-Morris Co.* v. *United States*, an unreported decision (N.D. Ohio 1968, 26 A.F.T.R. 2d 70–5369, 70–2 U.S.T.C. par. 9550) in which the controlling facts closely parallel those in this case. After declining to follow our decision in *American Metal Products*, the District Court held that the accumulated-earnings tax could be imposed despite the fact that there was no increase in earnings and profits in the year in issue by reason of there having been a redemption. That Court advanced two reasons for its decision. The Court in the *Ostendorf-Morris Co.* case stated that since section 532 does not speak in terms of permitting a particular amount of earnings and profits to accumulate, to construe the statute as we did in *American Metal Products* would have the unreasonable result

of placing a tax on a corporation that had one cent of current year's earnings but not on a corporation that used all its current year's earnings for redemption of its stock. As its second reason for its decision, that Court stated that to hold as we did in *American Metal Products* would set the stage for tax avoidance since earnings and profits could be accumulated in earlier years for redemption of stock in subsequent years and then reduced in subsequent years by the redemption, thereby in effect allowing a double credit.[7]

After considering respondent's arguments and the statement of the District Court in the *Ostendorf-Morris Co.* case, we abide by our holdings in *Corporate Investment Co.*, *supra*, and *American Metal Products Corp.*, *supra*. Our holdings in those cases are in accordance with the ordinary meaning of the words of the statute. We are not confronted in this case with either of the situations suggested by the Court in the *Ostendorf-Morris Co.* case and, therefore, do not pass upon

---

[7] Respondent in his brief states that in effect our holding in *Ted Bates & Co.*, T.C. Memo. 1965–251, is contrary to our holding in *American Metal Products Corp.*, 34 T.C. 89 (1960), affd. 287 F. 2d 860 (C.A. 8, 1961). Respondent in his brief states:

"In *Ted Bates & Company, Inc.*, 34 P–H Tax Ct. Mem. 1476 (1965), the taxpayer made sales of stock to its employees which was redeemed during the taxable year. The taxpayer *specifically* argued that the portion of the redemption proceeds paid to the selling shareholder which was properly chargeable to earnings and profits for the taxable year exceeded its earnings for that year and, therefore, taxpayer did not accumulate any earnings and profits for that year, a requirement for imposition of the tax. The Court stated that the argument was incorrect *as a matter of law* because it failed to recognize the difference between earnings and profits for a given year and accumulated taxable income."

As petitioner points out, respondent's statement is inaccurate since the facts in the *Ted Bates & Co.*, case show that the taxpayer did in fact have $175,000 of current year's accumulated earnings as shown by the following statement:

"Petitioner advances two arguments with respect to its redemption of Bates' stock. First, petitioner contends that the portion of the redemption proceeds paid to Bates, properly chargeable to its earnings and profits account ($1,700,000), exceeded its "earnings" for fiscal 1960 and that, therefore, petitioner did not accumulate any earnings and profits that year. * * *

"Petitioner's first argument is incorrect as a matter of law. It fails to recognize the difference between earnings and profits for a given year (see section 312) and accumulated taxable income (see section 535). The term "accumulated taxable income" means a corporation's taxable income minus certain adjustments (such as Federal taxes paid, section 535(b)), minus the dividends paid deduction provided in section 561, and minus the accumulated earnings credit for that portion of its earnings which was accumulated to meet the reasonable needs of its business. Petitioner apparently bases its argument that no earnings were accumulated during fiscal 1960 upon the fact that during that year it had taxable income in the amount of $4,369,471.68, paid Federal taxes of approximately $2,267,000, and paid an aggregate total of $1,924,580 to Bates and certain other stockholders in redemption of their stock, leaving a net accumulation of approximately $175,000. However, an examination of the applicable statutory provisions indicates that the distributions made by petitioner during fiscal 1960 do not qualify for the dividends paid deduction provided for in section 561, since the distributions were not pro rata within the meaning of section 562(c) but constituted preferential dividends. [Fn. omitted.]"

Since for other reasons we held the taxpayer in *Ted Bates & Co.*, *supra*, not to be subject to the accumulated-earnings tax in its fiscal year 1960 when the redemption of stock was made, that case is not contrary in its result to our prior decisions, and properly viewed, the words used in the opinion are not contrary to those decisions.

the result we would have reached in such a different factual circumstance.

Our decisions in *Corporate Investment Co.*, *supra*, and *American Metal Products Corp.*, *supra*, have been outstanding for many years but no substantial change has been made by Congress in the rule as to corporations subject to the accumulated-earnings tax. Since many taxpayers are acutely aware of the possibility of the imposition of the accumulated-earnings tax on closely held corporations, it is probable that some taxpayers have engaged in planning corporate distributions relying on our decisions in these cases.

We therefore hold that as to the year 1968 petitioner was not formed or availed of for the purpose of avoiding the income tax on its shareholder by permitting earnings and profits to accumulate instead of being distributed, and therefore is not subject to the tax imposed by section 531 for that year.

Petitioner's only contention with respect to the year 1967 is that it did not permit its earnings and profits in that year to accumulate beyond the reasonable needs of its business including the reasonably anticipated needs of its business. Petitioner recognizes that it has the burden of proof as to this contention.

Whether accumulations of earnings are beyond the reasonable needs of a taxpayer's business is essentially a question of fact. *Faber Cement Block Co.*, 50 T.C. 317, 328 (1968). The determination of the reasonable needs of the business must be made on the basis of the facts and circumstances existing in the year in issue and not by the events transpiring in subsequent years except to the extent that such events may throw a light upon the facts as they existed in the year in issue. *Dixie, Inc.*, 31 T.C. 415, 430 (1958), affd. 277 F. 2d 526 (C.A. 2, 1960), certiorari denied 364 U.S. 827 (1960).

The size of the accumulated earnings and profits is not determinative of the issue but rather, it is the reasonableness and the nature of the surplus which is the crucial factor, *Smoot Sand & Gravel Corporation* v. *Commissioner*, 274 F. 2d 495, 500–501 (C.A. 4, 1960), affirming a Memorandum Opinion of this Court, certiorari denied 362 U.S. 976 (1960).

Petitioner contends that the accumulations of earnings and profits in the years in issue were to finance the expansion of petitioner's business.[8] Respondent takes the position that petitioner had no specific,

---

[8] Petitioner also contends that accumulations of earnings were made during the taxable years in issue to provide for a possible tax liability of $184,111.48 as set up in the notice of deficiency sent to petitioner on March 8, 1968, covering taxable years 1964, 1965, and 1966. Petitioner's accumulations of earnings from prior years were more than adequate to meet this potential tax liability. Also, petitioner received the notice of deficiency in its taxable year 1968. Since the potential tax liability did not arise until

definite, and feasible plans for expansion of its business during the taxable years in issue and therefore had no reasonably anticipated need for the accumulations of earnings. Sec. 1.537–1(b)(1), Income Tax Regs.

Respondent's regulations specifically provide that a taxpayer is not subject to tax under section 531 on reasonable accumulations of earnings and profits for bona fide expansion of business or replacement of plant. Sec. 1.537–2(b)(1), Income Tax Regs. However, for expansion to constitute a reasonable need of the business, there must be a specific, definite, and feasible plan of expansion. *Barrow Manufacturing Co.* v. *Commissioner*, 294 F. 2d 79, 80–81 (C.A. 5, 1961), affirming a Memorandum Opinion of this Court.

The "plans" petitioner claims that it had for expansion at best were vague and indefinite and no more than exploratory in nature. Tracy's testimony shows that his discussions with representatives of General Motors Corp. discontinued in 1963, did not resume until 1968, and his efforts at that time to obtain additional markets for distribution were primarily on behalf of APC and only incidentally on behalf of petitioner. While Tracy had some preliminary discusssions in 1967 with representatives of Ford with respect to Ford's possible dissatisfaction with its present distributor of engines in the Michigan-Illinois area, the record does not show any basis for a reasonable expectation that petitioner would obtain this distributorship in the foreseeable future, if ever.

The record fails to demonstrate that petitioner had a realistic expectation of expansion, but rather indicates a hopeful but indefinite desire to develop new markets or add new product lines. Petitioner's "plans" to expand its business amounted to no more than a mere possibility of expansion at some indefinite date in the future. Such nebulous "plans" fail to provide a justification for the accumulation of earnings and profits where earnings retained from prior years are otherwise sufficient to meet the reasonable needs of the business. *Nemours Corporation*, 38 T.C. 585, 604 (1962), affd. 325 F. 2d 559 (C.A. 3, 1963).

Petitioner's "plans" for expansion must be viewed against the backdrop of a consistent pattern of substantial accumulations in prior years, the absence of any dividend history until 1967, the holding of

---

1968, petitioner has not shown justification for accumulations until that year. Since we have resolved the issue of petitioner's liability for the accumulated-earnings tax in petitioner's favor for the taxable year 1968 on another basis, we need not further consider this contention of petitioner.

Petitioner makes no argument based on its working capital needs. However, as respondent points out on brief, petitioner's liquid assets were more than ample for working capital needs computed on any of the bases used by the courts for determining working capital needs.

large amounts of cash, the redemption of some of its stock without a business reason therefor, and the substantial tax savings to Tracy resulting from the retention of earnings. *Helvering* v. *National Grocery Co.*, 304 U.S. 282 (1938).

We hold upon consideration of all of the evidence that petitioner in 1967 allowed its earnings and profits to accumulate beyond the reasonable needs of the business. The fact that petitioner's earnings and profits were allowed to accumulate beyond the reasonable needs of the business is determinative of the proscribed purpose in the absence of proof by a preponderance of the evidence that avoidance of tax with respect to its shareholders was not one of the purposes of the accumulation. *United States* v. *Donruss Co.*, 393 U.S. 297 (1969). There is no such proof in this case, and we, therefore, hold that petitioner is subject to the accumulated-earnings tax under section 531 for its taxable year 1967.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

———

TANNENWALD, *J.*, dissenting in part: I disagree with that portion of the majority opinion which is based upon the legal conclusion that an accumulation of current earnings during the taxable year 1968 is a sine qua non for the imposition of the accumulated-earnings tax for that year.

In *W. S. Farish & Co.*, 38 B.T.A. 150 (1938), affd. 104 F. 2d 833 (C.A. 5, 1939), the issue was the proper basis for accounting for property transferred to the corporation in a section 351 (then section 112 (b) (5)) exchange. The Board of Tax Appeals held that, although the transferor's cost was proper in computing taxable income, it was the book cost for the corporation that should be used in computing earnings and profits for the purposes of the tax on unreasonable accumulations of earnings. That case is therefore not controlling.

In *Corporate Investment Co.*, 40 B.T.A. 1156 (1939), the decision was based upon the ground that, although there were in fact earnings and profits as a result of a subsequent audit, the officer-shareholders of the corporation had made an honest mistake in estimating such earnings and profits at the end of the taxable year involved. Consequently, no improper motivation was found to exist. That case is therefore likewise not controlling.

In *American Metal Products Corporation*, 34 T.C. 89 (1960), affd. 287 F. 2d 860 (C.A. 8, 1961), the issue of earnings and profits versus taxable income was not raised or argued by the parties. It was raised by this Court on its own motion and disposed of without analysis and simply in reliance on *Farish* and *Corporate Investment Co.* See 34 T.C.

at 104. The issue was not appealed by the respondent, so the affirmance by the Eighth Circuit is of no significance.

I see no difficulty in interpreting section 532 so as to include earnings and profits of prior years within the statutory clause "by permitting earnings and profits to accumulate instead of being divided or distributed." A past situation can be "permitted" to become a current situation. In short, I find the reasoning of Judge Battisti in *Ostendorf-Morris Co.* v. *United States*, an unreported case (N.D. Ohio 1968, 26 A.F.T.R. 2d 70–5369, 70–2 U.S.T.C. par. 9550), totally persuasive. See also Opper, *J.*, dissenting, in *Corporate Investment Co.*, *supra* at 1177–1179.