STANDARD CORRUGATED CASE CORP., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Standard Corrugated Case Corp. v. Commissioner
Docket No. 7024-70.
United States Tax Court
T.C. Memo 1973-276; 1973 Tax Ct. Memo LEXIS 12; 32 T.C.M. (CCH) 1302; T.C.M. (RIA) 73276; December 17, 1973, Filed Seymour Marks, for the petitioner. George J. Mendelson, for the respondent. QUEALY
MEMORANDUM FINDINGS OF FACT AND OPINION QUEALY, Judge: The respondent *13 determined that there were deficiencies in income taxes due from the petitioner in the amount of $45,251.58 for the taxable year 1964 and in the amount of $60,698.72 for the taxable year 1965. The sole question involved in the determination of these deficiencies is whether 2 petitioner is liable for the surtax pursuant to section 531[1] as having been availed of for the taxable years 1964 and 1965 for the purpose of avoiding the income tax with respect to the shareholders of its parent corporation by permitting its earnings and profits to accumulate instead of being divided or distributed. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. The petitioner, Standard Corrugated Case Corp., is a New Jersey corporation having its place of business in Ridgefield, New Jersey. Petitioner filed corporate income tax returns (Forms 1120) for the taxable years 1964 and 1965 with the district director of Internal Revenue at Newark, New Jersey. As of the date the *14 petition herein was filed, the address of petitioner was 686 Grand Avenue, Ridgefield, New Jersey. 3 During the taxable years 1964 and 1965, until its liquidation in December 1965, Ridgefield Industries, Inc. (hereinafter referred to as "Ridgefield"), owned all of the stock of the petitioner. Elliot Liskin and Louis Liskin each owned 50 percent of the stock of Ridgefield. Upon the liquidation of Ridgefield in December 1965, Elliot Liskin and Louis Liskin each acquired 50 percent of stock of the petitioner. From its inception, the business of petitioner has consisted of the manufacture and sale of corrugated cardboard boxes or cartons for use by other industries in packaging. The manufacturing process consisted of combining raw paper known as Kraft liner board and a corrugating medium glued together in the form of a sandwich which is commonly called cardboard. The cardboard is then cut, slotted, folded, and printed with specialty designs and names of products and manufacturers who are to use the containers in the distribution and sale of their products. The raw materials used by petitioner are purchased from various paper mills generally located in the southeastern part *15 of the United States. 4 Beginning some years prior to the taxable years in question, the industry, of which the petitioner is a part, has undergone a process of integration whereby the producers of raw paper sought to combine their operations with the processing of such paper into the finished product, such as cardboard containers. In other words, the paper mills sought to extend their operations to include the manufacture of the container itself. However, there were geographic limitations on the extent to which such integration was feasible. The raw papers could be shipped in rolls over substantial distances at a reasonable cost. The finished container board or containers could not. In the norhteastern part of the United States, which already was served by independent box manufacturers such as the petitioner, it was apparently more difficult for the paper mills to break into the market. Independent box manufacturers such as the petitioner, who depended for their business upon proximity and service to the customer, continued in business in the northeast notwithstanding the overall trend in the industry towards integrated producers. 5 As a result of the competition *16 from the integrated producers, the petitioner, together with other similarly situated independent producers, sought from time to time to acquire or to establish a commonly-owned paper mill which would supply their needs. Such efforts consisted of the following: (1) Petitioner participated with others during the years 1958 and 1959 in the consideration and evaluation of the conversion of an existing tissue paper mill located in Mount Tom, Massachusetts, into a Kraft paper manufacturing mill. The report of the consulting engineers with respect to the conversion of the paper mill at Mount Tom, Massachusetts, to produce 150 tons per day of .009" corrugating board estimated the cost of the conversion to be $8,187,000. The proposed acquisition of the paper mill at Mount Tom, Massachusetts, was abandoned because it involved the conversion of an older, existing mill which had not been producing corrugating medium and was not going to produce the finest grade of corrugating material. 6 (2) Petitioner participated with others during the years 1959 and 1960 in negotiations for the construction of a .009" Kraft paper mill in St. Joe, Florida. The feasibility report rendered by the *17 engineers for Florida Gulf Fiber Co., Port St. Joe, Florida, estimated the cost of the mill to be $10,600,000. The total overall investment discussed in connection with the construction of the St. Joe, Florida, paper mill was initially $17,000,000. The group of independent converters participating with petitioner in the negotations for the St. Joe, Florida, paper mill broke up after approximately 14 months of discussions and conferences by reason of problems concerning control and managment. (3) Petitioner participated in negotiations in 1960 with another group of independent converters and Stone Container Corp. of Chicago, Illinois, for the construction of a Kraft liner board mill. Petitioner dropped out early in the negotiations because of serious differences with respect to the control and management of the proposed mill. 7 As a result of this experience, the petitioner became aware of the inherent disadvantages in joining with other indpendent processors to establish a common source of paper. First, the obvious success of the petitioner in its business reflected the knowledge and skill of its management. In joining with others to acquire a paper mill, there was the *18 problem of management and control. The petitioner would be committing its resources to the management of others. On at least one occasion, the petitioner withdrew from a proposed paper mill venture because a majority participant insisted on having voting control of the corporation. In addition, in any such venture, the participants would be required to enter into so-called "take or pay" contracts with the paper mill in order that the required outside financing could be obtained. This would obligate the petitioner to purchase more paper than it could use in its operations. 8 Finally, there was a dependency by the paper mill on independent processors, such as the petitioner, to take a part of the output of the paper mills. The paper mills needed the independent processor as much as the independent processor needed the paper mill. With the passage of time, experience demonstrated that except for relatively brief periods during which the available sources for paper might have difficulty meeting demand, the petitioner did not experience any difficulty in meeting its requirements for raw materials. As a result of the foregoing, while the petitioner had seriously considered such *19 proposals at various times in prior years, the petitioner's interest in becoming a participant in such a venture had clearly abated. As of the taxable years 1964 and 1965, the petitioner no longer seriously or definitively planned to invest with others in the acquisition or erection of a paper mill. Up to the time of the trial of this case, the petitioner had not invested in a paper mill. 9 For the taxable years 1961 to 1965, inclusive, the results of operations of the petitioner were as follows: STANDARD CORRUGATED CASE CORPORATION
COMPARATIVE PROFIT AND LOSS STATEMENT
1965
1964
1963
1962
1961
Sales (Net)
$4,623,238
$4,698,791
$4,337,959
$4,253,380
$4,117,678
Cost of Goods
2,829,959
2,706,148
2,326,504
2,410,260
2,238,665
Gross Profit
$1,793,279
$1,992,643
$2,011,455
$1,843,120
$1,879,013
Overhead Expenses
1,396,183
1,623,539
1,482,951
1,449,645
1,411,064
Operating Profit
$ 397,095
$ 369,104
$ 528,504
$ 393,475
$ 467,949
Other Income:
55,251
54,354
43,811
34,716
58,668
Dividends,
Interest (Net)
Net Profit
$ 452,347
$ 423,459
$ 572,315
$ 428,191
$ 526,617
Fed. Income Taxes
205,087
203,497
291,219
215,334
241,106
Net Profit (After
$ 247,259
$ 219,962
$ 281,096
$ 212,857
$ 285,511
Taxes)
NOTE: Cents
Omitted.
*20 The requirement of the petitioner for working capital in each of the taxable years 1964 and 1965 did not exceed the sum of $750,000. For the taxable years 1961 to 1965, inclusive, the assets and liabilities of the petitioner per books were, as follows: 10 STANDARD CORRUGATED CASE CORPORATION
COMPARATIVE BALANCE SHEET
1959-1965
1965
1964
1963
Cash
$1,796,714.45
$1,658,490.61
$1,726,710.73
Notes & Acct. Rec.
428,007.77
354,725.00
411,614.75
Less Res. for Bad Debts
(23,834.10)
(23,914.49)
(24,491.08)
Net Receivables
$ 404,173.67
$ 330,810.51
$ 387,123.67
Inventories
300,045.30
272,475.00
224.725.00
Prepaid Expenses
25,234.35
31,563.55
33,902.42
Bldg. & Fixed Assets
1,406,975.39
1,343,512.09
1,156,986.01
Less Depreciation
(903,182.11)
(807,494.12)
(693,308.54)
$ 503,793.28
$ 536,017.97
$ 463,677.47
Other Assets
525.00
425.00
425.00
Total Assets
$3,030,486.05
$2,829,782.64
$2,836,564.29
Accounts Payable
$ 106,025.46
$ 83,557.46
$ 147,481.61
Acc'd. Exp. & Sundry Taxes
257,980.19
247,504.59
367,815.06
Common Stock
1,000,000.00
1,000,000.00
1,000,000.00
Retained Earnings
1,666,480.40
1,498,720.59
1,321,267.62
Liabilities & Capital
$3,030,486.05
$2,829,782.64
$2,836,564.29
*21 STANDARD CORRUGATED CASE CORPORATION
COMPARATIVE BALANCE SHEET
1959-1965
1962
1961
Cash
$1,568,516.72
$1,396,579.84
Notes & Acct. Rec.
279,884.57
283,257.79
Less Res. for Bad Debts
(17,325.84)
(17,341.90)
Net Receivables
$ 262,558.73
$ 265,915.89
Inventories
175,300.00
177,000.00
Prepaid Expenses
16,220.49
28,270.65
Bldg. & Fixed Assets
1,011,017.78
961,718.16
Less Depreciation
(598,160.12)
(493,462.34)
$ 412,857.66
$ 468,255.82
Other Assets
425.00
425.00
Total Assets
$2,435,878.60
[2]
$2,337,347.20
Accounts Payable
$ 111,116.28
$ 132,999.89
Acc'd. Exp. & Sundry Taxes
224,591.57
257,033.77
Common Stock
1,000,000.00
[3] 1,000,000.00
Retained Earnings
1,100,170.75
947,313.54
Liabilities & Capital
$2,435,878.60
$2,337,347.20 11 In addition, in its corporate income tax returns for the taxable years 1964 and 1965, Ridgefield *22 reported total assets of $2,294,603 and $2,381,248, respectively, and liabilities of $115,370 and $72,150, respectively. Such assets consisted largely of cash, stocks, and bonds which had been acquired out of rentals and dividends paid by petitioner. The only other asset of Ridgefield consisted of the building rented by Ridgefield to the petitioner. During the taxable years 1961 and 1965, inclusive, petitioner distributed as a dividend to Ridgefield the sum of $60,000 in each year. Ridgefield, in turn, distributed a lesser amount to its shareholders. The undistributed earnings and profits of the petitioner for the taxable years 1964 and 1965 were accumulated for the purpose of avoiding the income tax with respect to the shareholders of Ridgefield within the meaning of section 532. 12 OPINION Section 531 imposes an additional tax or surtax on the accumulated earnings of certain corporations described in section 532. Insofar as material herein, section 532 provides: SEC. 532. CORPORATIONS SUBJECT TO ACCUMULATED EARNINGS TAX. (a) General Rule. - The accumulated earnings *23 tax imposed by section 531 shall apply to every corporation (other than those described in subsection (b)) formed or availed of for the purpose of avoiding the income tax with respect to its shareholders or the shareholders of any other corporation, by permitting earnings and profits to accumulate instead of being divided or distributed. In determining whether the earnings of the corporation have been permitted to accumulate for the purpose of avoiding the imposition of the income tax with respect to its shareholders or the shareholders of any other corporation, section 533 further provides, in part, as follows: SEC. 533. EVIDENCE OF PURPOSE TO AVOID INCOME TAX. (a) Unreasonable Accumulation Determinative of Purpose. - For purposes of section 532, the fact that the earnings and profits of a corporation are permitted to 13 accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid the income tax with respect to shareholders, unless the corporation by the preponderance of the evidence shall prove to the contrary. The Court is thus faced *24 with a question of fact. Helvering v. Nat. Grocery Co., 304 U.S. 282 (1938); Bremerton Sun Publishing Co., 44 T.C. 566 (1965); James M. Pierce Corporation, 38 T.C. 643 (1962), reversed on another issue 326 F.2d 67 (C.A. 8, 1964). What may have beeb decided in other cases involving the tax under section 531 will not resolve that question. The petitioner had accumulated its earnings and profits beyond the normal requirements of its business. It was incumbent upon the petitioner under the statute to prove that such funds were accumulated for other legitimate business purposes. In order to meet that burden, the petitioner in the statement submitted under section 534 and at the trial contended that the reasonable needs of its business should be enlarged to include the following: (1) Funds required by the petitioner to participate with other independent producers in acquiring or establishing a paper mill, including the resources to support 14 the petitioner's obligation to a "take or pay" contract which would be required for the financing of such a mill; (2) anticipated expenditures for modernization and replacement *25 of machinery and equipment, the cost of which might run as high as $700,000 over the ensuing years; and (3) the unfunded liability of the petitioner for pension and severance benefits. With respect to the proposed investment in a paper mill, there is no question that during the years 1958 to 1960, inclusive, the petitioner entertained plans to join with other independent producers in acquiring or establishing a paper mill. There is also no question that since that time, undoubtedly as a result of the experience of those negotiations, petitioner no longer pursued this objective with the same interest. In fact, it must have become apparent to the petitioner's principal officials, both of whom impressed the Court as being very knowledgeable, that the problem of control, which had been the "stumbling block" to their participation in the earlier ventures, 15 was inherent in any future proposal. While they might have liked to own an interest in a paper mill, the cost both in terms of investment and commitment, without having control of its operations, was more than they were willing to pay. Faced with this record, the Court is convinced that during the taxable years 1964 and *26 1965 the officers of the petitioner no longer entertained serious plans of participating with others in a jointly-owned paper mill. The fact that no such plan was evolved even up to the date of the trial of this case further buttresses our opinion. With respect to the requirements for modification and replacement of machinery and equipment, there was no evidence of any definite commitment for expenditures of the magnitude which would require further accumulation of earnings during the taxable years 1964 and 1965. Since this type of equipment requires considerable lead time, the failure of the petitioner to commit itself during the years in question negatives any pressing need. 16 The petitioner likewise has failed to show that such need, if it existed, could not have been met out of the reserves for depreciation. On the contrary, notwithstanding substantial additions during the years 1961 to 1965, inclusive, the net investment in fixed assets shows only a nominal increase. Finally, with respect to the contingent liability of the petitioner on account of its pension plan and its obligation for severance pay, the petitioner must be presumed to have made such accruals as *27 in the opinion of its management were adequate. A glance at the balance sheet of the petitioner will show that its management not only was knowledgeable but equally conservative. The accumulations of prior years were more than ample to meet any contingency. No basis was presented either actuarially or otherwise which would justify the further accumulation of earnings for the taxable years 1964 and 1965. In conclusion, irrespective of the burden of proof, the undisputed facts show that the earnings of the petitioner during the taxable years in question 17 were permitted to accumulate beyond the normal needs of its business. Under section 533(a), this fact would be determinative of the proscribed purpose to avoid the imposition of the surtax on the individuals in question unless the petitioner was able by a preponderance of the evidence to prove to the contrary. Petitioner submitted a statement under section 534 seeking to avoid that burden. Obviously, however, it is also incumbent on the petitioner to establish the facts relied upon in such statement as being sufficient to warrant the accumulation. With respect to all except the alleged plan to acquire an interest in a *28 paper mill, the petitioner must fail on the ground that the other purposes which were relied on, even if accepted, did not warrant any further accumulations. Furthermore, the petitioner failed to establish a sufficiently definite and real intent - or need - to invest in a paper mill. I. A. Dress Co. v. Commissioner, 273 F.2d 543 (C.A. 2, 1960); Dixie, Inc. v. Commissioner, 277 F.2d 526 (C.A. 2, 1960); GPD, Inc., 60 T.C. 480 (1973), on appeal (C.A. 6, Nov. 13, 1973); Barrow Manufacturing Company v. Commissioner, 294 F.2d 79 (C.A. 5, 1961). 18 In addition, in considering the capital resources of petitioner, we cannot ignore Ridgefield, its parent corporation. Ridgefield alone had accumulated sufficient surplus funds to participate in the acquisition or establishment of a paper mill if such action would become necessary in order to assure the petitioner a source of supply. Ridgefield had an equal stake in the business with the petitioner. Not only did Ridgefield own all the stock of the petitioner, but had accumulated its funds largely from the investment of rentals and dividends received from the petitioner. While we *29 regard the accumulation of earnings by the petitioner standing alone as being in excess of the reasonable needs of the business, when we look to the business as a whole and include the accumulated earnings of Ridgefield which were accumulated in excess of its own business needs, the evidence becomes even more conclusive. Cf. Inland Terminals, Inc. v. United States, 477 F.2d 836 (C.A. 4, 1973). Decision will be entered for the respondent. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated. ↩
2. The parties have erroneously stipulated the total assets figure shown above to be $900 in excess of the correct amount. The opinion does not make any adjustments on account of this error. ↩
3. Includes retained earnings of $500,000 transferred to capital in the year 1960. ↩